1816.

HART
v.
TEN EYCK.

*HART *against* TEN EYCK and others.

Where an *answer* is put in issue, what is confessed and admitted need
not be proved; but where the defendant admits a fact, and insists upon
a distinct fact by way of avoidance, he must prove the fact so insisted
on in defence.

If an administrator omits to file an inventory of the goods of the deceased,
pursuant to the statute, it is a strong circumstance in support of the
charge of improper conduct.

If an administrator exhibits an untrue account of the personal estate of
the deceased to the Court of Probate, by which he fraudulently obtains
an order for the sale of the real estate, he must not only account for
the personal effects omitted in his statement, but is answerable for the
real estate sold, and that, according to its value at the time of filing
the bill against him.

If a person having charge of the property of another, so confounds it
with his own that it cannot be distinguished, he must bear all the in-
convenience of the confusion; if he cannot distinguish and separate
his own, he will lose it; and if damages are given to the plaintiff, the
utmost value of the article will be taken.

A bill may be filed in this Court to redeem personal property pledged
for a debt. But the creditor holding goods in pledge may sell them
without a bill for foreclosure, on giving reasonable notice to the debt-
or to redeem.

*Aliter*, in case of a mortgage of *real* estate, which can never be sold with-
out a bill for foreclosure, and a decree for a sale.

*HENRY HART*, the father of the plaintiff, died intes- Nov. 23d, 1815,
tate, in *May*, 1788, leaving the plaintiff, then about four $\frac{and}{Jan.\ 16th, 1816.}$
years old, a younger son, and his wife, surviving. The plain-
tiff's brother died, under age, without issue, and intestate,
and the plaintiff's mother also died, intestate; and the plain-
tiff became entitled, as heir at law, to all the real and per-
sonal estate of his deceased father. The bill, which was
filed against *Abraham Ten Eyck* and *Jeremiah Van Rensse-
laer*, stated, that the plaintiff's father left a large personal
estate, consisting of leases, mortgages, ready money, cer-
tificates, called class-rights, public certificates, household
furniture, farming utensils, stock and grain, on a farm at
*Kingsbury*, in *Washington* county, where he died, goods and
chattels of great value beyond the amount of his debts; that
he also died seised of a large real estate, or in trust for him,
situate in different counties; that on the 16th of *January*,
1789, the defendants *Abraham Ten Eyck* and *\*Jeremiah*     [ * 63 ]
*Van Rensselaer* took out letters of administration, and pos-
sessed themselves of all the personal estate of the intestate,
of all the books and accounts relative thereto, and of all the
deeds and evidences of the real estate. That, on the 20th
of *March*, 1802, the administrators fraudulently, and under

false representations of the sums which remained due from the intestate, of the insufficiency of the personal estate to satisfy the debts, and of the value of the real estate, obtained an order of the Court of Probates for the sale of all the real estate of the intestate. That for the purpose of obtaining that order, the administrators exhibited to the judge of the Court of Probates, a statement and estimate of the intestate's property, (a) as amounting to 3,520 pounds, or 8,800 dollars; whereas, as the plaintiff charged, the statement and valuation were intentionally deceptive and grossly inadequate; that 15 class-rights, estimated at 2,500 dollars, consisted of 15 lots of land of 600 acres each, lying in the military tract, in the now counties of *Onondaga, Seneca,* and *Cayeuga,* which, on the 1st of *January,* 1802, were worth, at least, the average price of 3 dollars per acre, or the gross sum of 27,000 dollars, and for which letters patent had been taken out by one of the *administrators. That the other lands were not estimated at half their value; and that the house and lot in *Pearl* street were worth 1,250 dollars beyond the encumbrance; and that the bonds and mortgages were ample security, and bore an interest of 5 per cent. on each 100 acres, payable annually.

[ * 64 ]

That the administrators never made and filed an inventory of the goods, chattels, and credits of the intestate, in the office of the surrogate of *Washington* county, nor had they filed such inventory before the application to the Court of Probates for the sale of the real estate; nor had such inventory been since filed; nor had they, at the time the order for the sale of the real estate was made, applied the personal estate of the intestate to the payment of the debts. That the plaintiff left this state when he was about 11 years old, and went to *Canada,* where he remained until *November,* 1807, and, during all the period of his absence, the administrators never gave him any notice of their proceedings; but,

(a) The following is the statement made by the administrators, signed by them, and dated *January,* 1802:

| | | | | |
|---|---|---|---|---|
| Lots No. 7 | 127 acres, | | | |
| 8 | 172 | do. | in *Skenesborough,* estimated worth........£ | 400 |
| Lot 3 | 100 | | about two miles from *Albert Mabie's,*........ | 150 |
| Lot 19 | 80 | | ......,.................................. | 150 |
| Lot 29 | 52 | | ........................................ | 130 |
| Lot 33 | 100 | | *Buttlersbury* patent,..................... | 200 |
| Lot 10 | 34 | | rent and reversion of 49 acres,............ | 300 |
| Lot 60 | | | *Kingsbury* patent, lease 6l. per annum,...... | 80 |
| Lot 112 | 100 | | in possession of *Henry Lake,*.............. | 200 |

3 Bonds and Mortgages for 882l., at about 3 per cent. per annum,
    principal payable in *October,* 1802, now worth about............. 700
No. 11, in a patent granted to *William Wood,* on the east side of *Sco-
    harie kill,* 180 acres,....................................: 200
15 Military Class-rights,....................................... 1000
House and Lot in *Pearl* street, subject to a bond and mortgage held
    by *P. E. Elmendorf.*

on the day of the order for the sale of the real estate, procured *John C. Cuyler* to be appointed by the judge of the Court of Probates, *guardian* of the plaintiff; that the said guardian, understanding that he was appointed for the sake of form only, never investigated the accounts of the administrators of the personal estate, nor ever made any inquiry as to the real estate, or took any care of the plaintiff's interest.

That on the 5th of *April*, 1802, the adminstrators caused an advertisement to be inserted in the newspaper called the *Albany Register*, that all the real estate of the intestate would be sold at auction on the 4th of *May*, then next, at the *Tontine Coffee-House* in *Albany*; and without any other notice, the greater part of the intestate's estate was sold on the 4th of *May*, and several days following, the particulars of which were stated, and the net proceeds of which sales amounted to 8,482 dollars and 75 cents, according to the account rendered by the administrators to the Court of *Probates. That at the time of such sales, the property sold was worth at least 27,900 dollars. That the most valuable parts of the lands were struck off by *Ten Eyck*, who acted as auctioneer, to the relations, friends, and acquaintances of the administrators; that many of the purchases were made under an express or implied trust, that the administrators, or one of them, should be interested therein; that the three mortgages against *Spencer*, *Tupper*, and *Kingsley*, were bought in for the benefit of *Ten Eyck*, and assigned to him, or to some one by him appointed, and the full amount of the mortgages received.

[ * 65 ]

That the administrators, *Edward Cumpston*, and the intestate, about the year 1783, entered into partnership in the purchase of soldiers' rights to bounty land; that the purchases and transfers of such rights were all made in the name of *Cumpston*, who continued to hold them until about the year 1790, when the letters patent for the bounty lands were generally issued in the names of the officers and soldiers entitled to the lands; that more than 100 of these rights had been previously purchased for the use of the said partnership, at their joint expense, and that, upon a settlement, more than 20 rights were allotted to each partner, none of which were assigned to the intestate. That the administrators procured conveyances from *Cumpston* of all the rights to which the intestate was entitled under the partnership, (except 15 rights of which they admitted him to be owner,) to them or one of them, or in trust for them, and have obtained awards for them by the *Onondaga* commissioners, and disposed of them unknown to the plaintiff. That the intestate, in his lifetime, was owner of a great number of class-rights granted to the troops of this state, which the adminis-

1816.

HART
v.
TEN EYCK.

[* 66]

trators, or one of them, held in trust for the intestate; that these rights have been disposed of by the administrators, or one of them, and patents obtained by them, or one of them, and the lands sold, or are kept concealed from the plaintiff. That the administrators refuse *to render any account of their administration, or to disclose the real and personal estate of the intestate, or to pay to the plaintiff his share thereof, &c. The bill sought for a discovery and relief.

The defendants *Ten Eyck* and *Van Rensselaer* put in their joint and several answer, on the 10th of *December*, 1808. They denied that any personal estate of the intestate remained, after paying his debts, but that the personal estate was altogether insufficient for that purpose, and referred to accounts annexed to their answer. The defendant *Van Rensselaer* said, that being a creditor of the intestate, he joined with *Ten Eyck* in the administration, at his request, and on his promise that he should be at no trouble in transacting the business of the estate; and that he, therefore, took but little charge in the administration, and could not give, of his own knowledge, any account of the personal estate or debts; but, from the information of *Ten Eyck*, he believed the account given by him to be just and true. They said they knew of no personal property or estate whatever, of the intestate, except as they afterwards set forth in their answer; and *Ten Eyck*, for himself, said, that being a creditor of the intestate, he with *Van Rensselaer*, took out administration, the 15th of *January*, 1789, from the surrogate of *Washington* county, and that he went to *Kingsbury*, and used all reasonable diligence in ascertaining the amount of the personal estate. They admitted that the intestate was entitled to, or claimed, divers parcels of land, which were valued by them, on the 1st of *January*, 1802, (as stated in the plaintiff's bill,) and they knew of no other real property of any kind, of which the intestate died seised or possessed.

*Ten Eyck* said, that he took possession of all the personal estate and effects of the intestate, which could be found or obtained, with the books and accounts, and sundry deeds and papers relative to the real estate, but denied that he ever concealed the same from the plaintiff; and he annexed *a particular statement thereof to his answer. *Van Rensselaer* denied that he ever possessed himself of any of the personal estate of the intestate, except what is mentioned in the account, or of any deeds, writings, or papers, relating to any real or personal estate, other than powers of attorney, and transfers of military rights and certificates described. That previous to his death, the intestate deposited, for safe keeping, with the defendant, the powers and transfers for conveying 15 soldiers' rights, and which remained in his

[* 67]

possession until the death of the intestate; and on the 25th of *April*, 1795, he, *Ten Eyck*, filed the same powers and transfers in the office of the clerk of the county of *Albany*, agreeably to the act, and had them registered there, and took the clerk's receipt for them. That the patents for those rights were taken out by him, some time in the year 1790, and remained in his possession a considerable time; that he afterwards delivered them to some person, but whom he could not recollect, nor when he delivered them, and that none of them was in his possession, nor did he know where they are.

The defendants denied that the order for the sale of the real estate was obtained fraudulently, or by any false representations; but that the real and personal estate were justly and truly stated, according to the best of their knowledge and belief, and were so stated to the Court of Probates: they admitted that, to obtain the order, they exhibited the statement and valuation of property to the Court of Probates, as set forth in the plaintiff's bill, but denied that they knew the statement and valuation to be deceptive and grossly inadequate; that they made the same according to their best judgment, information, and belief. That in making the valuation, they took into consideration the great uncertainty of value of those lands, owing to the many interfering claims and frequent transfers of the same lots by the same soldiers to different persons; and that several of the military lots, which were specified, had been awarded by *the *Onondaga* commissioners to other persons; that considerable doubts were, therefore, entertained by the defendants, as to the validity of the titles to the lots specified, as well as to the others; that they employed counsel to attend before the commissioners, but the proofs of title were so imperfect, that only one lot was awarded to the estate of *Hart*, or the plaintiff. That military lots were not worth, at that time, three dollars per acre, and if the titles had been good, the 15 lots would not have been worth near the sum of 27,000 dollars. They also denied that the other property was undervalued; and the three mortgages, though sold fairly at auction, brought much less than the sum at which they were valued. The defendants said they did not know whether any inventory of the personal property had been filed, though one had been prepared by *Ten Eyck* soon after the death of the intestate. *Ten Eyck* said, that all the personal estate of the intestate was applied to pay the debts, previous to the application for the order for the sale of the real estate. He denied that *Cuyler* was appointed guardian for the plaintiff for form's sake merely, or that any such suggestion was made to him, whereby he was lulled into security or inattention to his guardianship.

They admitted that the plaintiff went to *Canada*, and re-

1816.

HART
v.
TEN EYCK.

[ * 68 ]

1816.

HART
v.
TEN EYCK.

[ * 69 ]

[ * 70 ]

sided some time with his uncle, *Aaron Hart*, (who was a creditor of the intestate by bond for 2,000 dollars,) and, afterwards, with his cousin, *Moses Hart*, son of the said *Aaron Hart*. That *Moses Hart* took an interest in the matters of the intestate's estate, examined the books and accounts in relation to it, and was in *Albany* before and at the time of the sale of the real estate, and heard and approved of the proceedings in relation to it. That the order of the sale was as stated in the bill; that on the 4th of *May*, the first day of the sale, two hundred persons, at least, were present, and among them, *Moses Hart*; that *A. Ten Eyck, jun.*, at the request of the defendants, acted as auctioneer, and no property was struck off, until *Moses Hart* was satisfied that no better bid could be obtained. The mortgages, and several parcels of land in *Butlersbury*, *Kingsborough*, &c., were sold on that day. *Isaac Ranson* purchased the mortgages for *A. Ten Eyck, jun.* The remainder of the sale was postponed to the next day, and, as few bidders then appeared, it was postponed to the 12th of *May*, and notice thereof given in two gazettes, and 200 copies of the advertisement, in handbills, were distributed in *Albany*. That on the 12th of *May*, lot No. 8, in *Skenesborough*, and eight military lots, were sold; the particulars of which sale were set forth, and the names of various persons who were present at the sale were mentioned. The defendants denied that they were concerned, directly or indirectly, by trust or otherwise, in the sales; or that any offer to purchase by private sale had been made, or that the lands could have been sold better. They took no pains to examine any of the lands, in order to ascertain their value; but relied on general information as to the value, and their own knowledge. That the sales were fairly made; and they denied that the most valuable of the lots were struck off to their relations and friends, (except in the instance mentioned for *A. Ten Eyck, jun.*) and they denied all concern, collusion, or secret understanding, between them and the purchasers, or in any manner relating to the lands so sold.

The defendants denied that they, with *Cumpston* and the intestate, or either of them, were ever in partnership in the purchase of soldiers' rights; but admitted that *Cumpston* and the intestate acted as agents for them, in purchasing soldiers' rights, and were furnished with money for that purpose; that *Cumpston* and the intestate purchased, at their stores in *Albany*, a number of such rights for four and five pounds each, for they which paid partly in cash, and partly in goods, which belonged to them, and the profits arising *from such purchase with goods, were to be for their benefit exclusively.

*Van Rensselaer* admitted that *Cumpston* and the intestate,

as agents, purchased for the defendants and others, whom he named, about 100 rights, and that the powers to convey the rights were, from time to time, lodged with him, the defendant; that on the 5th of *June*, 1786, *Cumpston*, *Hart* and the defendant, came to an adjustment relative to 63 of the rights so deposited, and *Cumpston* took 12 of them to his own use, *Hart* retained 21 for his own use, and the residue, with the powers of transfers, were left with him, the defendant, for the joint benefit of himself and *Ten Eyck*, and for which they had before advanced cash to *Cumpston* and *Hart*, at the rate of five pounds for each right; 15 of them were deposited by *C.* and the same number by *H.* That soon after the adjustment, in 1786, he purchased of the intestate *seven* of the twenty rights then held and retained by *Hart*, at an advanced price of 20 per cent., and he believed the seven rights were, as he specified, but he could not distinguish the seven from the rest of the ten rights. *Ten Eyck* said, he was concerned with *Van Rensselaer* in the purchase of the soldiers' rights; that he had no knowledge of the transactions, but what he derived from *Van Rensselaer*, who had the management of the business.

*Van Rensselaer* said, that some time previous to *May*, 1787, the intestate being much embarrassed on account of debts, and being considerably indebted to him, deposited with him a number of class-rights, by way of pledge or security for the debts so due from *Hart* to the defendant; that the amount of debts due to him was £689 9*s.* 7*d.*, but he could not recollect how many certificates of class-rights were so deposited, nor in whom any of them were originally vested, not having kept any written memorandum of them. That he, afterwards, received verbal instructions from the intestate, to dispose of *and manage the said class-rights as he should think best, in order that he might retain, out of the proceeds thereof, the amount of his debt, and that he should account therefor with *Hart*. That in pursuance of such deposit and instructions, he afterwards located in his own name 3,880 acres of land, lying on the north side of the *Sacondaga* river, and on the 28th of *May*, 1787, received a patent for the tract, and that the location and patent comprehended the quantity of land due for the class-rights so deposited with him by *Hart*. That class-rights, about that time, were generally worth about one shilling per acre, prior to location; that on the 9th of *November*, 1790, he conveyed to *Ten Eyck* 503 acres of the patent, pursuant to an order in writing, dated the 21st of *February*, 1788, which order, he believed, was lost or destroyed; that he received no consideration from *Ten Eyck*, nor did he know the terms on which *Hart* disposed of the land; that on the 27th of *November*, 1790, he conveyed 750 acres of the tract to *James Boyd*, an assignee of *Job Wright*, to satisfy

**59**

1816.

HART
v.
TEN EYCK.

[* 71 ]

an obligation of *Hart* to *Boyd*, dated the 14th of *July*, 1783 ; that no money was required to be paid to him, and he did not know the terms or consideration of the contract.   That according to the general instructions of the intestate before mentioned, he conveyed, in 1791, the remainder of the tract, being seven lots, which he specified, to different persons who were named, and credited the estate of the intestate with the sums of money received for the same, according to the accounts exhibited, in which he made no charge for commissions in relation to his services.   That he was afterwards called upon, by *Isaac Lytle*, to convey 1,000 acres of the contract, in consequence of a contract of the intestate, dated the 14th of *July*, 1783 ; that having conveyed away all the said tract, he agreed to convey to *Lytle* 750 acres of land on *Grass* river, belonging to the defendant, in lieu of .the 1,000 acres, which *Lytle* accepted, and the 750 acres were

[ * 72 ]

accordingly conveyed to him ; that he *charged the estate of *Hart* with 1,000 acres at 6s. and 6d. per acre, being the price of the *Sacondaga* lands at that time, and that lands on *Grass* river now sell at four and five dollars per acre ; that he does not know where the contract of *Hart* now is ; that he knows of no other class-rights of the intestate, than those so delivered to him, nor of any certificates of public debt belonging to the intestate, and that no such certificates ever came into his, the defendant's, possession or custody.

*Ten Eyck* said, he knew nothing on the subject of the class-rights mentioned by *Van Rensselaer*, but from hearsay, except the conveyance of the 503 acres to him.   That prior to the location of the tract, the intestate asked him if he had any class-rights to locate, and that if he had, they might be located together with those of the intestate ; and that he accordingly delivered his class-rights to the intestate, who, afterwards, informed him, that he had delivered them to *Van Rensselaer*, and gave him an order on *Van Rensselaer*, for the amount of them, on which he received the conveyance of the 503 acres.

*Ten Eyck* then set forth, as he said, a just and true account of all the goods and chattels, rights and credits of the intestate, so far as the same had come to his knowledge, consisting of stock on the farm, farming utensils, and household furniture, and the prices at which they were sold, amounting to 86l. 13s., and also a list of promissory notes, which he put into the hands of a justice to be collected, and for which he received from the justice 27l. 12s. 7d.   The defendant also set forth an account of bonds and mortgages ; an account of all the personal estate of the intestate which he had received, which corresponded with the debtor side of his account, as exhibited to the Court of Probates.

The total, with interest to the 1st of *January*, 1802, being 3,256*l*. 10*s*. and 8*d*.

*Van Rensselaer* also set forth an account of what he had received out of the peronal estate, and of the moneys paid *and advanced in relation to the estate, and which agreed with the debit and credit side of the accounts exhibited to the Court of Probates, and leaving a balance due to him from the estate, on the 1st of *January*, 1802, of 1,406*l*., or 3,515 dollars. He also stated an account of moneys retained and paid by him to the 8th of *June*, 1799, leaving a balance due him of 109*l*. 1*s*. 7*d*.; and he also exhibited a statement of debts due from the estate of the intestate, unsatisfied, amounting, on the 1st of *January*, 1802, to 2,372*l*. 7*s*. 10*d*., or 5,930 dollars and 98 cents.

He further stated, that, soon after letters of administration were taken out, he made an inventory of such of the intestate's personal property as could be found or discovered, with the aid of *Rynier Visscher* and *Peter B. Tierce*, two respectable inhabitants of *Washington* county, and which was annexed to his answer, dated the 11th of *February*, 1789. He set forth, also, a list of all the books of accounts of the intestate, in his hands, or known to him.

*Van Rensselaer* having died on the 19th of *February*, 1810, the suit was revived against his legal representatives, who are the other defendants in the cause.

*Abraham A. Lansing*, one of the defendants, answered to the bill of revivor and disclaimer: general replications were filed to the answers of all the other defendants.

The above statement of the pleadings presents the matters in controversy between the parties. It is not thought necessary, for the purpose of these reports, to attempt to give a detail of the depositions and exhibits in the cause, which were very voluminous. The material parts of the evidence are, it is believed, sufficiently stated in the very elaborate opinion delivered by the Court.

The cause was argued in *November* last, by *Van Vechten*, and *Henry*, for the plaintiff, and by *Woodworth*, and *E. Williams*, for the defendants.

*The following points were stated by the counsel for the plaintiff :—

1. That the accounts of the administrators were erroneous and false.

2. That the order of the Court of Probates for the sale of the whole of the real estate of the intestate, was fraudulently obtained.

3. That the order of sale was fraudulently executed.

1816.

HART
v.
TEN EYCK.
[ *73 ]

[ *74 ]

1816.          4. That the defendants are, therefore, answerable for the present full value of the estate sold under that order.

HART
v.
TEN EYCK.

5. That there have been fraudulent concealments and dispositions of various portions of the real estate to which the plaintiff was entitled, as heir at law of the intestate, especially by *Jeremiah Van Rensselaer,* deceased; and that his representatives should be decreed to pay the present full value of what may have been sold, and to convey what remained unsold to the plaintiff.

The defendants' counsel stated the following questions:—

1. Have the defendants received more personal property than is contained in their statement; and if so, what is the amount thereof?

2. Had the administrators, previous to the 20th of *March,* 1802, applied all the personal estate that came to their hands, in the discharge of debts, and were there still large sums due from the intestate remaining unpaid?

3. Was there any thing fraudulent or knowingly false in relation to the valuation of the property exhibited to the Court of Probates? If not, is there such error, as in equity will make them liable for the mistake?

4. Have the administrators so conducted the sales as to make themselves responsible to the complainant?

5. Is there proof of any real estate, other than that set forth by the administrators?

[ * 75 ]

6. Is there evidence to prove that *Jeremiah Van Rensselaer* located lands in trust for *Henry Hart,* other *than that derived from the answer, which avers that *Henry Hart* directed the sale of the lands?

7. And if there is not, does the answer implicate the representatives of *Jeremiah Van Rensselaer,* in respect to the location at *Sacandago?*

*Jan.* 15th, 1816.          The cause stood over for decision until this day, when the following opinion was delivered by

THE CHANCELLOR. This is a suit by the son and heir of *Henry Hart,* calling the administrators of his father's estate to account, and charging them with gross and multiplied acts of waste and fraud, by means of which, as it is alleged, a large and valuable estate, descended to him by inheritance, has been dissipated.

The testimony taken in the cause is voluminous, and the transactions which are embraced by the case are, in some degree, intricate, owing to the length of time, and the nature and variety of the subjects to which they relate. To give

62

as much simplicity and perspicuity as may be in my power to the examination of so complicated a case, I shall arrange what I have to say under the following heads :—

1. Whether the accounts of the administrators, as exhibited in the first instance to the Court of Probates, and afterwards to this Court, be erroneous and false, and accompanied with concealments and fraudulent dispositions of various portions of the estate.

2. Whether the order of the Court of Probates for the sale of the real estate was either fraudulently obtained, or fraudulently executed ; and,

3. In case these charges, or either of them, be true, what is to be the rule or measure of damages ?

I ought, perhaps, to observe preliminarily, that in the course of the investigation, I have felt, with unusual sensibility, the weight and delicacy of the duty imposed on me, by reason of the magnitude of the inquiry, the relation *in which the parties stand to each other, the grave accusations, and the important principles which the case involves. On the one hand, the plaintiff is a young heir, stripped of all his expectations, and relying solely on the paternal protection of this Court in the assertion of his rights, which, he says, have been wantonly sacrificed during his infancy. On the other hand, the original defendants were administrators and trustees, who, by the nature of their undertaking, were charged with the execution of disinterested and burthensome trusts ; and I shall always be extremely averse to hold such characters responsible on slight grounds, or where there is evidence of fair and upright intention. But if the facts necessarily lead to the conclusion, that the administrators have been guilty of gross negligence, or of premeditated and fraudulent concealments and dispositions of the estate of the infant, it will then be equally my duty, however painful the performance of it, to animadvert upon such conduct with a freedom and severity due to truth and justice.

1. The administration of the personal estate of *Hart* was almost exclusively assumed by *Ten Eyck;* and *Van Rensselaer,* though a joint administrator, had little or no concern in it. We will, then, in the first place, examine how far *Ten Eyck* had rendered a just and true account of his administration, from the 15th of *January,* 1789, when letters of administration were granted, to *January,* 1802, when the account of the personal estate, and of the disposition of it, was rendered by the administrators to the Court of Probates.

*Ten Eyck* says, in his answer, that all the goods and chattels of *Hart,* at the time of his death, so far as the same came to his knowledge, exclusive of *choses in action,* con-

63

*1816.*

HART
v.
TEN EYCK.

[ * 76 ]

1816.

HART
v.
TEN EYCK.

[* 77 ]

sisted of stock on the farm, farming utensils, and household furniture, at *Kingsbury*, in the county of *Washington*, which he enumerates, and which were valued, in the first instance, only at 265 dollars, and which, when sold, produced only 216 *dollars and 62½ cents. To show that this very meagre account of the moveable estate was incorrect and false, the plaintiff has examined several witnesses to prove what goods and chattels were left by *Hart*. *Moses Baxter*, who is mentioned in the inventory, which I shall have occasion to notice hereafter, as an overseer, and which I understand to mean an overseer on the farm, says, that he was acquainted with the farm on which *Hart* lived when he died, and that at the time of his death, in *July*, 1788, he was engaged in merchandizing and superintending his mills; and he enumerates the personal property in farming stock and household furniture, which he left on the farm, to the amount, in value, of 700 dollars, and of which no account is rendered by *Ten Eyck*. He next specifies the lumber which belonged to *Hart*, and which had partly been converted into boards and plank, and lay at his mills, at and after the time of his death, to the amount of about 39,000 boards and plank, and which he values at 4,333 dollars. There was, also, a number of cedar posts and vessel timber, amounting to 310 dollars 42 cents. He next specifies 32 bushels of wheat, which were received after *Hart's* death by *Visscher*, the agent of *Ten Eyck*, and which, in part, at least, he conveyed to *Albany*, by direction of *Ten Eyck*; and he mentions some other minor articles; and no account has been rendered of any of this property · by *Ten Eyck*. *Jonathan Jackaways*, another witness on the part of the plaintiff, proves that *Hart* left, at his death, a number of the articles of personal property specified by *Baxter*, such as horses, oxen, young cattle, and household goods, and a large quantity of boards and plank, sawed and piled up at his mills, and a large quantity of hewed timber. He says, also, that *Hart* left dry goods and groceries, but he cannot specify the nature or value. He further proves, that *Rynier Visscher*, who was *Hart's* clerk at the time of his death, was left by *Ten Eyck* at the house *where *Hart* lived, and was authorized, by *Ten Eyck*, to collect the debts, and manage the affairs of the estate; and that *Visscher* did collect debts to a large amount, and pay them over to *Ten Eyck*. It may be observed, in this place, as a fact worthy of notice, that this same *R. Visscher* presented to *Ten Eyck*, in 1793, (5 years after *Hart's* death,) an account of moneys due him, for services as clerk to *Hart*, from 1781, down to the year 1788, to the amount of upwards of 700 dollars, and which account was paid by *Ten Eyck*. A

[ * 78 ]

third witness on this subject is *Adiel Sherwood*, who also proves that *Visscher* was the authorized agent of *Ten Eyck*, in respect to the estate ; and he says he knew *Hart*, and knew the farm on which he lived, and that *Hart* was a merchant and farmer, and superintended his mills, and left household furniture, cattle, horses, farming utensils, and a great quantity of boards and plank at his mills, at the time of his death ; and he, himself, purchased of *Visscher*, as agent of *Ten Eyck*, a quantity of logs at the mills belonging to *Hart*, and for which he paid 50 dollars to *Visscher*. He says, further, that *Hart* owned, at his death, a quantity of oak timber, lying in *Argyle* and *Kingsbury*, and that he bought of *Ten Eyck* and *Visscher* about 30 dollars worth of timber, and paid them for it. He also refers to a quantity of *red cedar* at the head of *Lake George*, and which is particularly explained by *Baxter*. A fourth witness on this point is *Samuel Atwood*, who says, that *Hart* was a merchant, and dealt in lumber, and that lumber, consisting of boards and ship plank sawed at *Whitehall*, and belonging to *Hart's* estate, to the amount of 400 dollars, came to the hands of *Ten Eyck*.

Here we have, then, by the testimony of four unimpeached witnesses, a detailed account of personal property left by *Hart*, at the time of his death, to the amount of upwards of 6,000 dollars, and of which no account is rendered by the administrator. The account exhibited contains only *a few trifling articles, scarcely exceeding 200 dollars ; and this is said to be all the moveable property that ever came to the possession or knowledge of the administrator. Can it be possible that this assertion is founded in truth ? The bulk of this property consisted of lumber and of stock on the farm, which lay open to the eye. An inventory was taken, at the request of *Ten Eyck*, on the farm at *Kingsbury*, on the 11th of *February*, 1789, and the appraisers were *Peter B. Tierce*, and this same *Rynier Visscher*, the former clerk of *Hart*, and the subsequent agent of *Ten Eyck*. Could *Visscher*, who lived with *Hart* at his death, and who had been his clerk for a number of years preceding, have been ignorant of all this mass of property, which is ascertained and established by the witnesses who have been examined ? It appears to me to be impossible ; and yet he certifies, as a true and perfect inventory of the goods and chattels of *Hart*, exclusive of the notes and bonds, the few old, and, generally, useless articles specified, and amounting, in value, only to 215 dollars. Either the witnesses are not to be believed, or *Rynier Visscher knew* that the inventory which he so certified was grossly defective and false. But *Ten Eyck*, though the inventory was under his own hand,

1816.

HART
v.
TEN EYCK.

[ *79 ]

HART
v.
TEN EYCK.

[* 80]

The omission
to file an *inven-*
*tory* according
to the statute, is
a strong cir-
cumstance in
support of the
charge of im-
proper conduct
in an adminis-
trator.

never thought proper to recognize it in the mode, and under the sanction, which the law required. The statute of 1787 had directed that the executors and administrators should make a true and perfect inventory of all the goods and chattels of the deceased, and should cause the same to be indented, and deliver one part to the surrogate, *upon the oath* of the executor or administrator, that the same was just and true. This duty was altogether omitted, and it was still omitted in 1802, when application was made to the Court of Probates for an order to sell the real estate, not-withstanding the act under which the application was made must have reminded the party of his duty; for it expressly declared, that no part of the real estate should be ordered to be sold, until the executors or administrators *shall have duly made *and filed* an inventory before application for such sale.

The account exhibited by *Ten Eyck* to the Court of Probates is only an account of *moneys received* by him as administrator, and not of all the goods and chattels of *Hart;* and the oath that was administered in that Court, was only that the papers referred to contained a true account *of his transactions,* as administrator. Until the administrators were compelled to answer here to a charge of concealment and fraud, we have no explicit declaration on oath, what were the goods and chattels of *Hart,* which came to their knowledge. In the words of Sir *John Strange,* (*Orr* v. *Kaines,* 2 *Vesey,* 194.) " the omission to exhibit an inventory, which every executor ought, especially in a deficient estate, was an imputation against him, and which always inclines the Court to bear harder on such an executor."

But there are other and stronger reasons to doubt of the accuracy of *Ten Eyck's* account of the amount of the goods and chattels of *Hart,* which came to his knowledge. His accounts, exhibited under oath to the Court of Probates in 1802, show the extreme carelessness, at least, with which the affairs of his trust were conducted. He had been called upon in 1799, at the instance of *Aaron Hart,* a creditor of the intestate, to disclose the assets which had come to his hands, and the manner in which they had been disposed of. In that answer, he admitted the receipt of sundry sums of money belonging to the estate, and received of different persons, to the amount of more than 300 dollars, which were totally omitted in his subsequent account; and he also omitted the acknowledgment of the receipt of the annual rent of two leases belonging to the estate, and which had been regularly paid to him by *Ralph Schenck,* from the time that he assumed the administration down to the year 1802. These acknowledged omissions, and which were

equally omitted in the account under oath exhibited to the Court of Probates, and in the account under \*oath annexed to the answer, may amount, without interest, to upwards of 700 dollars; and such gross inaccuracies (all in his own favor) were supposed, according to a suggestion upon the argument, to have been cured, in a very considerable degree, by a deduction voluntarily made to guard against error, at the bottom of the *debit* side of the account exhibited to the Court of Probates, which is in these words, " to deduction, as per Mr. *Ten Eyck's* agreement, 200*l*." What *agreement* is here referred to, or with whom such an agreement was made, is utterly unaccountable. But whatever may be the real meaning of the ground of the deduction, such singular inaccuracy in keeping accounts in relation to a trust committed to him by law, deserves the severest reprehension, and must, of itself, very much shake the credit of his accounts at large.

There are not only very strong presumptions arising out of the circumstances which I have detailed, that more of the personal estate of *Hart* must have come to the hands of *Ten Eyck* than he has admitted, but the case affords direct and certain proof of the fact.

*Baxter* says, that *Hart*, at his death, had, at the head of *Lake George*, a number of cedar posts, which were drawn to *Fort Edward*, by *Pitcher* and *Negus*, both of whom are now dead; and he believes they were owned by *Hart*, and were so drawn by direction of *Ten Eyck*, because he was so informed by *Visscher*, the agent of *Ten Eyck*, now dead; and he knows that the posts were drawn by direction of *Visscher*. He says, further, that in the winter after *Hart's* death, he received a letter from *Ten Eyck*, informing him, there was a quantity of cedar, part of which was suitable for vessel timber, lying at the head of *Lake George*, belonging to the estate of *Hart*, and requested him to carry the same to *Fort Edward*, to be rafted to *Albany*, on the boards and plank, which boards and plank the witness understood \*were the same that belonged to *Hart* at his death. He says, the cedar and timber referred to consisted of about 100 garden or fence posts, and about 25 sticks, and that he drew it, and placed it by the side of that drawn by *Pitcher* and *Negus*.

If this letter, referred to by *Baxter*, was lost, the parol proof of its contents was good evidence; and the presumption of its loss is very strong, arising from the lapse of time. It was an order acted upon and executed by the witness. It is coupled with facts. But we have another letter from *Ten Eyck*, relating to the lumber, which is free from any difficulty, for it is an exhibit in the cause, and is of decisive weight. The letter was dated the 11th of *February*, 1790,

*1816.*

HART
v.
TEN EYCK.

[ \*81 ]

[ \*82 ]

and directed to *R. Visscher;* in that he says, " I can't learn that the cedar timber of *Hart's* is yet got from the lake — wish you to acquaint *Baxter,* that the cattle ought to work for the estate as well as for him, in drawing saw logs. If he does not intend to ride the cedar, wish you to get some one to do it with the cattle of the farm. You ought to study the interest of the estate a little, and not let the whole go to wreck."

This letter is full of important disclosures. It was observed, by Archdeacon *Paley,* in his *Horæ Paulinæ,* that amidst the obscurities, the silence, or the contradictions of history, if a *letter* can be found, we regard it as the discovery of a landmark, by which we can correct, adjust, or supply the imperfections and uncertainties of other accounts. We have here conclusive evidence that *Hart* had lumber at *Lake George,* which came to knowledge, and fell under the control of the administrator ; and this fact furnishes several necessary inferences, for it shows that the account exhibited by *Ten Eyck* must be untrue, and that the evidence of *Baxter* and *Sherwood,* as to the timber at *Lake George,* was perfectly correct ; and it reflects credit and strength upon all the other testimony respecting the lumber. It shows, further, that there were then *cattle on the farm belonging to the estate, and employed in the business of drawing logs. This is in corroboration of the testimony of *Baxter,* that there were eight oxen and two horses left by the intestate, and of which the administrator gives no account. The cattle of the farm, which he says ought to work for the estate, must mean cattle that belonged to *Hart.* These could not have been the " one old horse sold to *R. Visscher* for 6*l.*," and the " two steers sold to *Baxter,*" mentioned in the answer as a part of the inventory ; for the answer says, that the articles of which an inventory is now given, were, " soon after the granting letters of administration, converted into money ; " and, in proof of this, it appears that *George Wray,* the purchaser of the most valuable article sold, is credited with the payment of it, as early as *May,* 1789. The conclusion appears to me inevitable, that the cattle, as well as the timber alluded to in this letter, of *February* 11th, 1790, were goods and chattels of the intestate, which the administrator has thought proper not to account for; and this unexplained omission renders his answer utterly unworthy of credit.

There is also in this letter a gentle rebuke of *Visscher,* as being a careless agent of the estate, and a pretty plain intimation that the assets (whatever they were) were in a course to ruin, either from waste or plunder.

There are other circumstances in the case, which also go to destroy the credit of the answer.

In an estimate of the property of *Hart*, made by *Ten Eyck*, in his own hand, of the date of *July*, 1790, he says, "personal property on the farm will sell for about 100*l*." What did he mean by this personal property, when he says now, that all the goods and chattels were converted into money *soon after* he administered, and when it appears, by his account, that he did sell to *George Wray* property specified in the inventory, to 28*l*., and received payment in the spring of 1789? He certainly alluded to *other* personal *property than that specified in his inventory, or in the account annexed to his answer, and of course, he alluded to property of which he now omits to render any account. There is another fact still more fatal to any confidence in the account now exhibited. In an account in the hand of *Ten Eyck*, stated to be an account of his, as administrator, with the estate of *Henry Hart*, deceased, the estate is charged, as of the 10th of *March*, 1790, in these words: "Paid for sail cloth and cable for raft, 6*l*. 13*s*. 3*d*." Is not this clear and convincing proof that the lumber mentioned by the witnesses came to the knowledge and possession of *Ten Eyck*, and that he went to this expense to transport it down the *Hudson*? I have not heard of any explanation attempted to be given to these circumstances; and I think the evidence, taken together, not only warrants, but absolutely *demands*, that *Ten Eyck* should be held to account for all this personal property belonging to *Hart*, which is ascertained and detailed in the case, and of which no account or credit has been rendered, and no explanation has or may be given. It is sufficient, at least, to establish the presumption that it all came to his possession, and to cast upon him the burden of acquitting himself of that presumption, by proof that it did not.

There is another fact that ought not to pass unobserved while we are upon this part of the case. In the account exhibited by *Van Rensselaer*, against the estate of *Hart*, and rendered to the Court of Probates in 1802, he adds, at the foot of the *credit* side of his account, these words: "By 200 cedar posts omitted, 2*s*. — 20*l*." The question naturally arises, When and from whom were these posts received? There is no date or explanation given. It must be presumed that they were received after the death of *Hart*, and came through the hands of *Ten Eyck*, who had charge of all this personal estate.

The conclusion of the examination on the subject of these personal assets, leads to very serious and painful reflections. *It is most undoubtedly true, that if this personal property

1816.

HART
v.
TEN EYCK.

o [ * 84 ]

[ * 85 ]

69

1816.

HART
v.
TEN EYCK.

which *Hart* left at his death, and which we have every rea son to conclude came to the knowledge and possession of the defendant *Ten Eyck*, had been duly credited as it ought to have been, the estate would not have been insolvent, and there would have been no need of an application to the Court of Probates. There would have been a balance in favor of the estate, even after allowing all the claims that had been presented against it, and all the payments that had been made; allowing even the very suspicious charge of *Rynier Visscher*, for services rendered as clerk to *Hart*, for many years before his death, *without any credit given*, and when the account was not rendered to the administrator until five years after *Hart's* death, and even after allowing the entire account and balance claimed by *Van Rensselaer*. If this be so, what a dreadful responsibility has been incurred ˮy these administrators in the unnecessary sacrifice of the ⸝hole real estate of the infant heir?

The account exhibited by *Van Rensselaer*, to the Court ⸗f Probates in 1802, and again to this Court, in his answer, ıs the next subject for examination; and it is with deep regret, I am obliged to say, that a more inaccurate and unreasonable account has rarely fallen under my observation.

It appears, by exhibit 12, that *Hart*, on the 20th *May*, 1784, by a receipt under his hand, acknowledged to have received of *Van Rensselaer* 1,400 dollars in final settlement notes, and which he promised to pay on demand, and on this receipt there was an endorsement by *Van Rensselaer*, of having received 905 dollars on the 15th *April*, 1785, which left a balance of 495 dollars due. But what was due? Not 495 Spanish milled dollars, but 495 dollars *in final settlement notes;* and yet he charges them at par, and with interest, though they were probably not then worth, in the market,

[ * 86 ]

3 shillings in the pound. He charges, *also, as prior in order to the note, for *final settlement certificates paid Hart*, in error, 76 dollars, and for *Samuel Gilbert overpaid*, 60 dollars, and for *certificates* issued twice to *Hart*, to 166 dollars, and for a *certificate lent him* on the 25th *May*, 1785, to 315 dollars. All these certificates are put down as at par, and interest charged accordingly on their nominal value. It is to be observed, that there is not a particle of proof, out of the charge itself, for any of these *items*, except the note, and the presumption would naturally be that the *certificates paid in error*, and the *certificates issued twice*, must have been charges existing, if at all, prior in point of time to the note, and must have been adjusted and settled when the note was given.

The mode in which interest is charged on all these certificates, is in this random manner, viz: "Interest to 1791, average about 15 years, at 4 per cent., 271*l*. 3*s*. 4*d*." This

70

was nearly doubling the principal, even at 4 per cent., and it is in this loose mode, without dates or precision. How he could make out a period of 15 years down to 1791, when the first account began in 1784, is to me incomprehensible.

Another charge, in 1796, is as follows: "Paid *John W. Wendell*, hat manufactory, 119*l.* 6*s.*" So heavy a charge as this ought at least to have been accompanied with some intelligible explanation, if it was unsupported by any voucher. As it now stands, it is absolutely without meaning, in reference to the estate of *Hart.* The same observation applies to some other minor charges, on which I shall not detain myself; but I shall proceed to another charge, in respect to which there is a voucher in evidence. In the account presented to the Court of Probates, there is this charge, as of *August,* 1790: "Paid patent fees, on soldiers' rights, 77*l.* 6*s.* 8*d.*, and interest thereon for 5 years, 28*l.* 11*s.* 6*d.*" In the same account annexed to the answer, the sums are the same, and the date the same, but the charge is a little varied, and is in these words: "Paid patent *fees and other charges* on soldiers' rights, &c." I presume *Van Rensselaer,* when he put in his answer, had discovered the receipt, which he took of the deputy secretary of state, on the 6th of *August,* 1790, and which shows that all the fees which he paid as administrator of *Hart,* on soldiers' rights, was but 24*l.* 12*s.* instead of 77*l.* 6*s.* 8*d.* The words, *other charges,* thrown into the last account, to support it, are left to rest on such a vague assertion, without any pretence for support by document or explanation.

[ * 87 ]

If all the charges in this account of *Van Rensselaer,* which are without any proof, are to be rejected, it will reduce the account from 3,470 dollars to a sum less than 1,000 dollars; and instead of a balance of 437 dollars and 50 cents, in his favor, when resort was had to the real estate of *Hart,* there was a debt of, perhaps, 2,000 dollars due from him to the estate, even admitting every other part of the account to be correct.

That those charges in the account which are without proofs are inadmissible, and cannot be upheld by the answer, is a proposition which I consider to be as well settled in law, as it is in reason. But as the counsel for the defendants seem to have entertained a different opinion on this point, and as the question is very material in this cause, in respect to various claims and pretensions on the part of *Van Rensselaer,* I have felt it incumbent on me to look into the authorities on which the proposition is founded.

In *Kirkpatrick* and *Thrupp* v. *Love,* (*Amb.* 589.) the plaintiffs had dealings with the defendant, in the way of merchandise, and on a decree for an account both parties

**1816.**

HART
v.
TEN EYCK.

[ * 88 ]

were to be examined. On taking the account, the plaintiffs admitted the receipt of some goods, and in the same sentence said, they had paid the defendant for them, and the question was, whether they were bound to prove the payment. Lord Ch. *Hardwicke* held not, as they charged and discharged themselves *in the same sentence;* *but that it would have been otherwise, if the discharge or avoidance had been in a *distinct sentence.*

The rule, as here laid down, is similar to the one which we find declared at law, that if it be sworn on a trial that a defendant confessed a debt, but said, *at the same time,* he had paid it, the confession shall be valid as to the payment, as well as to the debt. This is said to have been so ruled by *Hale; (Tri. per Pais,* 363.) and there has been the like decision in the Supreme Court of this state. (*Carver* v. *Tracy,* 3 *Johns. Rep.* 427.)

In the case in *Ambler,* the parties were examined as *witnesses* against each other, on taking the account; and the credit even of that case seems to be shaken by that of *Talbot* v. *Rutledge,* which was a little prior in time, and referred to by Mr. *Ambler* in the margin of the other case, and pretty fully reported in 4 *Bro.* 74. In this latter case, the defendant was examined on oath, on taking an account before the master, and he acknowledged the receipt of some moneys, but stated that he had disbursed them at other times, on account of the concern. The master, upon this proof, charged him with the receipt, and put him upon proof of the discharge, and Lord *Hardwicke* confirmed the report.

If these two decisions are correctly reported, I cannot undertake to reconcile them; but neither of them apply to the point how far the *answer* will, of itself, support a matter set up by way of avoidance, or discharge. It appears to me, that there is a clear distinction, as to proof, between the *answer* of the defendant and his examination as a *witness.* At any rate, the question how far the matter set up in the answer can avail the defendant, without proof, is decidedly and rationally settled.

The rule is fully explained in a case before Lord Ch. *Cowper,* in 1707, reported in *Gilbert's Law of Evidence,* p. 45. It was the case of a bill by creditors against an executor, for an account of the personal estate. The executor *stated in his answer that the testator left 1,100*l.* in his hands, and that, afterwards, on a settlement with the testator, he gave his bond for 1,000*l.*, and the other 100*l.* was given him by the testator as a gift for his care and trouble. There was no other evidence in the case of the 1,100*l.* having been deposited with the executor. The answer was put in issue, and it was urged that the defendant having charged

[ * 89 ]

Where    an
answer is put in
issue, what is

72

himself, and no testimony appearing, he ought to find credit where he swore in his own discharge. But it was resolved by the Court, that when an answer was put in issue, *what was confessed and admitted by it, need not be proved;* but that the defendant must make out, *by proof,* what was insisted on by way of avoidance. There was, however, this distinction to be observed, that where the defendant admitted a fact, and insisted on a *distinct* fact, by way of avoidance, he must prove it, for he may have admitted the fact under an apprehension that it could be proved, and the admission ought not to profit him, so far as to pass for truth, whatever he says in avoidance. But if the admission and avoidance had consisted of one *single fact,* as if he had said the *testator had given him* 100*l.,* the whole must be allowed, unless disproved. This case is cited by *Peake,* (*Ev.* 36. *in notis,*) to show a distinction, on this subject, between the rule at law and equity ; and that in chancery one part of an answer may be read against the party without reading the other ; and that the plaintiff may select a particular admission, and put the defendant to prove other facts. He preferred, as he said, the rule at law, that if part of an answer is read, it makes the whole answer evidence ; and even Lord *Hardwicke,* in one of the cases I have cited, thought the rule of law was to be preferred, provided the Courts of law would not require equal credit to be given to every part of the answer.

On the above doctrine, in the case from *Gilbert,* I have to remark, in the first place, that it is undoubtedly the long *and well-settled rule in chancery, whatever may be thought of its propriety. Lord *H.* says, in the case of *Talbot* v. *Rutledge,* that if a man admits, by his answer, that he received several sums of money at particular times, and states that he paid away those sums at other times in discharge, he must prove his discharge, otherwise it would be to allow a man to swear for himself, and to be his own witness. But, in the next place, I am satisfied that the rule is perfectly just, and that a contrary doctrine would be pernicious, and render it absolutely dangerous to employ the jurisdiction of this Court, inasmuch as it would enable the defendant to defeat the plaintiff's just demands, by the testimony of his own oath, setting up a discharge or matter in avoidance. Mr. *Evans,* in his notes to *Pothier,* (Vol. 2. 156—8.) has examined this point with great ability. After citing the case before Lord *Cowper,* he says, and says truly, that it is founded upon accurate principles, and in reference to the course of proceeding in chancery. When the answer is put in issue, the defendant must support, by proof, all the facts upon which he means to insist, while the plaintiff may rely upon every fact admitted, which he conceives material,

1816.

HART
v.
TEN EYCK.

confessed and admitted need not be proved; but the defendant must prove what he insists on by way of avoidance.

[ * 90 ]

1816.

HART
v.
TEN EYCK.

without being bound to the admission of any others. But when the answer is offered in evidence at law, no part of it is immediately in issue. It is only parcel of the evidence, and if one side introduce it, the other may insist upon the whole being read; and if read, it does not necessarily follow that it must be wholly admitted as true, or wholly rejected as false. The credit of any, and of every part, is left to the jury, who are not bound to believe equally the whole answer, but may believe what makes against, without believing what makes for, the party who swears in the answer. This rule is applicable to every kind of evidence, and has often been acknowledged by the judges at law. (Lord *Mansfield*, in *Bremon* v. *Woodbridge*, *Doug.* 788. *Chambre*, J., in *Roe* v. *Ferrers*, 2 *Bos. & Pull.* 548.)

[ * 91 ]

*The distinction, therefore, as *Evans* says, is not between Courts of law and equity, but between *pleadings* and *evidence*. If an answer is introduced collaterally, and merely by way of evidence in chancery, it ought to be treated precisely as in a Court of law. On the other hand, if, in a Court of law, the plea confesses the matter in demand, but avoids it by other circumstances, the proof of the avoidance is incumbent on the defendant. The same distinction was lately taken in the case of *Ormond* v. *Hutchinson*, before Lord *Erskine*. (13 *Vesey*, 47.) It was said, that when passages are read from an answer which is replied to, and is not an answer to a mere bill of discovery, they are not read as *evidence*, in the technical sense, but to show what the defendant has *admitted*, and which, therefore, need not be proved. The only explanation necessarily accompanying the rule, is, that you must not stop short with a sentence, so as to garble a single fact, but you must read the answer so as to complete the immediate subject to which the defendant is answering. This is all. It does not apply to *distinct* matter; and the admission of *one fact*, does not establish the assertion of *another*. (a)

[ * 92 ]

While upon this point, it may not be amiss to notice *the

(a) To the cases on the above point, that the answer is not evidence when it sets up matter affirmatively in avoidance or discharge, the following authorities have been added by *the chancellor*, as tending further to show that the doctrine in the text is not only well settled in the *English* jurisprudence, but has been equally recognized in our own.

Sir *William Blackstone* lays down the rule, in his *Commentaries*, (Vol. 3. 451.) as one of undisputed admission and practice, at that time, (1768,) that the plaintiff in chancery at the hearing, "may read such part of the defendant's answer as he thinks material or convenient," but that the defendant "may not read any part of his answer."

In *Thompson* v. *Lambe*, (7 *Vesey*, 587.) Lord *Eldon* said, "He was clearly of opinion, a person charged by his answer cannot, by his answer, discharge himself; not even by his examination, (before the master,) unless it is in this way: if the answer on examination states, that upon a particular day he received a sum of money, and paid it over, that may discharge him; but if he

rule, that though one witness against the direct and positive averment of the answer be not sufficient ground for *a decree, yet if that witness be corroborated by circumstances, it will be sufficient. (Lord *Thurlow*, in *Pember* v. *Mathers*, 1 *Bro*. 52.) It has, also, lately been ruled, that the answer containing the denial may also, *in itself,* *contain the circumstances giving greater credit to the witness, sufficient to found a decree against the defendant. (*East India Company* v. *Donald*, 9 *Vesey*, 275.)

I have thus, and I trust satisfactorily, shown, that the answer of *Van Rensselaer* is not sufficient to establish any of the charges which he sets up against the estate of *Hart*,

1816.

HART
v.
TEN EYCK.

[ * 94 ]

---

says, that upon a particular day he received a sum of money, and upon a subsequent day he paid it over, that cannot be used in his discharge, for it is a different transaction." In *Boardman* v. *Jackson*, (2 *Ball and Beatty*, 382.) the general rule was not only admitted by the learned counsel, on each side, but the distinction between pleadings and proof was stated in the manner Mr. *Evans* has done. The counsel on one side contended the rule in equity to be, that what a defendant admits, the plaintiff need not prove, but that if the defendant insists, by way of avoidance, on any distinct fact, he must by evidence prove it. The counsel, on the other side, on the part of the defendant, admitted, " that where a plaintiff refers to an answer as *constituting part of the pleadings in the cause,* the defendant cannot, by a separate passage of the answer, discharge himself from any admission he may there have made; *that* he can only do by producing evidence. But when a plaintiff refers to an answer *in another cause,* by way of evidence, he makes the whole answer evidence, and the defendant may then read any part of it in his defence. The same distinction exists, at law, between pleadings and evidence. If a plea confesses a fact, but at the same time avoids it by other circumstances, the defendant must substantiate the avoidance by proof." The Lord Chancellor of *Ireland* then observed, in giving his opinion, that " It is admitted in argument that where a bill is filed, calling on a defendant to account, and the plaintiff is entitled to answer, if the defendant sets forth in a schedule to his answer an account, charging himself with sums of money, and in another schedule an account of the disbursements of those sums, he cannot, according to the practice of this Court, avail himself of the second schedule to discharge himself in taking the account, although he would be charged on his admissions in the first schedule." He admitted this principle did not apply to documents, and which *formed no part of the pleadings in the cause,* but were offered merely as matter of evidence ; nor did it apply where the answer of a party in *another cause* was resorted to as evidence.

The rule admitted in this case was understood and intended to be the rule of the *English* chancery ; for none but *English* authorities were referred to, and they were generally the same with those mentioned in the text.

In *Beckworth* v. *Butler*, (1 *Wash. Rep.* 224.) a bill was filed in the Court of Chancery, in *Virginia*, against an administrator, for distributive shares of the intestate's estate. The answer, among other things, set up a gift from the intestate to the administrator of a bond, which formed the principal part of the personal estate. This allegation in the answer was not supported by proof, and the chancellor directed the administrator to account for the amount of the bond. The defendant appealed to the Court of Appeals, and the decree was affirmed; and the president, in delivering the opinion of the Court, observed, that " the answer of a defendant in chancery is not evidence where it asserts a right affirmatively, in opposition to the plaintiff's demand. In such a case, he is as much bound to establish it by indifferent testimony, as the plaintiff is to sustain his bill. It would be monstrous indeed, if an executor, when called upon to account, were permitted to swear himself into a title to part of the testator's estate." This same doctrine, and in the language of this very case, was afterwards, in *Paynes* v. *Coles*, in the

75

1816.   and that all those which rest upon his answer alone, must, of course, be rejected.

HART
v.
TEN EYCK.

There is another charge in the account of *Van Rensselaer* which may require a more particular attention, and which is in these words : " To 1,000 acres of land furnished *I. Lytle*, pr. obligation, 6s. 6d.   325l."

There is reason to believe that this charge is inaccurate and unjust.

The charge is founded upon a receipt which *Hart* gave to *Isaac Lytle*, the 7th of *October*, 1784, in which he ac-- knowledges to have received of *Lytle* a doctor's right of 1,000 acres of land, and which he promises to manage to the best advantage, for *Lytle*.   The testimony of *Lytle* has

same Court of Appeals, (1 *Munf. Rep.* 373.) recognized as correct. *Roane*, J., said, the rule was " well settled ;" and the counsel in support of the defendant, who brought the appeal, did not attempt to question it. The rule is not without equal sanction in our own Courts. In *Bush* v. *Livingston* and *Townsend*, (2 *Caines's Cases in Error*, 66.) the counsel on one side (*Benson* and *Harrison*) contended, that whatever the answer sets up in avoidance, even of that which is admitted in the answer, must be proved, and the answer is no proof of it ; and the counsel on the other side (*Riggs* and *Hoffman*) acknowledged the rule. " As to matter of avoidance being to be proved, that (say they) we do not deny. The nature, however, of an avoidance is to be seen. It is something subsequent, and *dehors* that which is admitted or alleged, as if a debt be acknowledged, but it be added *you released it*, or *I paid it ;* there the release or payment, being matter of avoidance, must be proved." Such prompt and explicit concurrence in opinion between opposite and experienced counsel, is evidence of the general sense of the profession as to the certainty and solidity of the rule. But the case of *Green* v. *Hart*, (1 *Johns. Rep.* 580.) contains the opinion of the Court of Errors, on the very point discussed in all these cases, and carries the doctrine to its most unrestricted extent. *Hart* had charged in his bill that he paid a full and valuable consideration for the note endorsed to him by *Green*, who, in his answer to this charge and the interrogatory founded upon it, alleged that part of the consideration for endorsing the note was usurious. Mr. Chancellor *Lansing* held, that this allegation of usury was merely in avoidance, and was not sufficient without other proof. On appeal, by *Green*, his counsel admitted, that the answer was not evidence to any collateral matter suggested by way of defence ; and the counsel on the other side asserted, that there being an allegation of usury. which was denied by the replication, and being put at issue, it was incumbent on the appellant (the defendant in chancery) to prove it. The decree was affirmed, and Mr. J. *Spencer*, in delivering the *unanimous* opinion of the Court, said, that " with respect to the first point, it is to be observed, that the respondent was in possession of *Johnson's* note as endorser, and the fact of the absolute endorsement by *Green* was *prima facie* evidence of a full and adequate consideration paid for the note. The respondent was under no necessity of inquiring into it ; but he did allege that the consideration was a full and valuable one. This the appellant might have denied ; and had it been incumbent on the respondent, he must have proved the allegation, or failed in his suit. The burden of showing that the consideration was illegal or inadequate rested on the appellant. When he goes into a charge of usury, he departs from the question put to him, which admitted only of an affirmative or negative answer ; and it was wholly immaterial whether it was the one or the other. *I view, therefore, the appellant's answer, charging usury. as insisting on a distinct fact, by way of avoidance. The respondents having replied, and given him an opportunity to prove the fact, and he having failed to do so, his answer is no evidence of the fact. This is a well-established principle in chancery proceedings, and will be found recognized in every treatise on evidence in that Court."*

been taken to explain this transaction: he says, that he possessed a right of 1,000 acres of land, issued to Dr. *Willard*, for services rendered by him as a surgeon in the army, and that he delivered it to *Hart*, at the date of the above receipt, to be deposited in the surveyor-general's office, together with a location made by him under the same. That after the death of *Hart*, he attempted to obtain a patent for those lands, and calling on *Van Rensselaer* for assistance, he produced the receipt given by *Hart*. That *Van Rensselaer* said the administrators had sold that right, as supposing it to belong to *Hart*, and he offered to hold himself liable for it; and *Lytle* gave up *Hart's* receipt, and took one from *Van Rensselaer* of the date of the 4th of *March*, 1789, in which *Van Rensselaer* promises to settle with *Lytle*, and mentions *Hart's* receipt as specifying the class-right to have been issued to Dr. *Willard*. That afterwards, in *March*, 1794, he received *of *Van Rensselaer* two deeds, containing, in the whole, 750 acres of land in *St. Lawrence* county, which he received in full for the military class-right above mentioned; and that it was agreed between them, that *Van Rensselaer* should retain the residue, or 250 acres, for his services and expenses in that business.

This statement shows a remarkable inaccuracy in the negotiation between *Lytle* and *Van Rensselaer*. The receipt of *Hart* was for a *doctor's* right, without designating what doctor, but *Lytle* says it was Dr. *Willard's* right for services rendered by him as a surgeon, and *Van Rensselaer*, in acknowledging *Hart's* receipt from the hands of *Lytle*, says, that the very receipt of *Hart* specified the right to be Dr. *Willard's*. The original receipt, being now produced, contains no such thing. It is simply a doctor's right, and the proof in the cause shows conclusively, that Dr. *Willard's* right never did belong to *Lytle*. It appears, by exhibit XI, that Dr. *Moses Willard* sold his right for 1,000 acres of land, on the 2d of *September*, 1783, to one *Spangler*, and that *Spangler*, on the 8th of *November*, 1783, sold and transferred it to *Hart*, who deposited it in the secretary's office, on the 12th of *October*, 1784, and it was afterwards, by his direction, delivered to *Van Rensselaer*, who located it on the *St. Lawrence*, as I shall hereafter show. We are, then, left in very great uncertainty as to the authenticity and fate of the military class-right received from *Lytle*. It was none of the class-rights with which the *Sacondaga* location was made, for they were all made by *Hart*, long before the date of the receipt in question, and there was no doctor's right among them. In what way it was ever appropriated by *Hart*, or by any other person for his use, does not appear; and there is one *item* of testimony which would induce us strongly to suspect that

*1816.*

HART
v.
TEN EYCK.

[ * 95 ]

77

1816.

HART
v.
TEN EYCK.

[ * 96 ]

it was returned to *Lytle*, and that the whole charge is without foundation. In an account in the hand of *Ten Eyck*, (exhibit No. 60,) purporting to be an account of the estate of *Henry Hart* against *Lytle*, there is this singular charge: "To a class-right of 1,000 acres, per *Lytle's* book, 40*l*." What could this possibly mean, other, than that *Lytle* himself had credited the return of the right in question?

There are, also, some other parts of *Lytle's* testimony that serve to perplex the subject. He says, that when he deposited the *doctor's* right, and which he most mistakingly converts into Doctor *Willard's* right, he delivered, at the same time, a location *made by him under the same*. Why did he not explain when and where he had made that location? He must have known in whose name and on what land it was made; and why did he not go to the surveyor-general's office, to see what had been done under that right and location, before he went to *Van Rensselaer* for assistance? How does it appear that *Van Rensselaer* had already sold that right, as he said he had, when he so promptly assumed to satisfy *Lytle?*

So much inaccuracy and mystery attends this whole transaction, that it is difficult to know where to fix a steady belief.

But admitting the right was never returned to *Lytle*, and was lost, with what equity or justice could *Van Rensselaer* appropriate 250 acres of that right to himself, and yet charge the estate of *Hart* with the whole 1,000 acres, and that too at the price of 6*s*. 6*d*. an acre, when it is admitted in the answer, that class-rights were worth but one shilling an acre prior to location, and when *Lytle* himself testifies, that at the time he received the 750 acres from *Van Rensselaer*, he does not believe those lands could have been sold for more than two shillings an acre? Yet, notwithstanding all this, the estate of *Hart* is charged with 1,000 acres furnished *Lytle* at 6*s*. 6*d*. an acre!

If any allowance is to be made for the extinguishment of this right, it can only be for its then value as an unlocated class-right, or the value of one shilling per acre.

I have now done with the *debit* side of *Van Rensselaer's* account, and shall proceed to the other, or the credit side; *and if I am not mistaken in my views of the testimony, it will be found to be still more objectionable.

[ * 97 ]

A prominent part of the credit relates to what is well understood in the case, by the name of the *Sacondaga* lands. The answer of *Van Rensselaer* admits that in 1787, *Hart* deposited with him a number of class-rights, as a pledge or security for debts due from *Hart* to him, to the amount of about 689*l*. 9*s*. 7*d*. He did not recollect the number of the class-rights, nor in whom they were originally vested, as he

78

kept no written memorandum; that he afterwards received verbal instructions to manage and dispose of them to the best advantage; that in pursuance of the deposit and instructions, he located in his own name on 3,880 acres, on the *Sacondaga* river, and on the 25th of *May*, 1787, he received a patent for the same. These lands, he says, he afterwards conveyed partly to the order of *Hart*, and partly to different purchasers, and duly credited the estate with the result, without any charge for commissions.

The credit given in *Van Rensselaer's* account, of the proceeds of these lands, is as follows, viz :—

```
1,497 acres sold at auction, for . . . . . . £346  4  9
  400   do. conveyed to Ten Eyck, and
  750   do. to Wright, in pursuance of
        authority from Hart, without any
        consideration received.
1,242 acres conveyed to different indi-
        viduals, whom he names, to . . . .  515 12  0
─────                                       ─────────────
3,889 acres . . . . . . . . . . . . . . . . £861 16  9
```

We will now examine the proofs, to see how far this is a just and true account.

It is in proof (see exhibit No. 10.) that *Hart*, on the 17th of *July*, 1783, filed in the surveyor-general's office, a location for 5,500 acres of land, at or near the *Sacondaga* river, and that the location was founded on military class-rights *or certificates and transfers duly owned by him, and duly delivered into the office; and that, as the right of one of the soldiers failed, the valid class-rights so located on, amounted to 5,000 acres of land. This location was afterwards, on the 19th of *February*, 1787, transferred by *Hart* to *Van Rensselaer*, with authority to *Van Rensselaer* to take out the patent in his own name. This conveyance, as the answer admits, was in trust, by way of security for some debts due to *Van Rensselaer;* and there is a sufficient proof of the trust without the answer, for it is admitted by a certificate of *Van Rensselaer*, of the date of the 21st of *October*, 1788; (see exhibit No. 10;) and it is admitted also, by the accept ance of the order of *Hart*, of the 21st of *February*, 1788, (see exhibit No. 9.) in which *Hart* orders him to convey to *Ten Eyck* 400 acres out of the *Sacondaga* lands, for which he (*Van Rensselaer*) had obtained a patent *for him*, (*Hart*,) on the 26th of *May*, 1787.

That the lands were conveyed to *Van Rensselaer* in trust, is thus in proof; but that they were conveyed in trust, to pay *debts* due to him, is without any proof, except the asser-

[ * 98 ]

HART
v.
TEN EYCK.

tion in the answer; and I doubt much whether the answer is evidence to that point. There was no need of the answer to prove the trust. It is established by regular testimony, and the condition of the trust was not stated in the acknowledgment of it by *Van Rensselaer*, in 1788; and the unqualified performance of the order of *Hart* to convey part of the land to *Ten Eyck*, and the unqualified assumption and performance of the contract of *Hart* to convey a still larger portion of the land to *Wright*, are acts of *Van Rensselaer*, which form very weighty evidence that these lands were held subject, *absolutely*, to the orders of *Hart*, without any such encumbrance upon them. There is no schedule given of the particular debts, or of the nature of them, or when payable, and the answer is extremely loose on the subject; it says only that the debts were *about* such a sum.

[ * 99 ]

*Van Rensselaer* was, undoubtedly, bound to show and establish his debts; his answer is not competent proof. The debts so secured amounted, as he says, to *about* 689*l.* 9*s.* 7*d.*; but if we recur to his account, which contains all his demands against *Hart*, back to the year 1784, it will be seen that there were no debts due when he received the class-rights for 5,000 acres in trust, except upon the certificates, which he charges as paid in error, or paid twice, or lent or included in the balance of the note due; and all these certificates and the balance together, at their nominal price, or par, and with interest on that nominal price from the time charged, and the small draft on *Tapp*, as mentioned in the account, included, will not all, scarcely, exceed 500*l.* at the time the transfers were made. The pretension, therefore, that the class-rights were deposited to secure so large a debt as 689*l.*, is false, even upon the face of his own accounts; and if those claims founded on certificates are reduced down to the real market value of certificates at the time, then, even admitting that they were all duly proved, and admitting even that they were not included in the note, *Van Rensselaer's* debt, when he received the class-rights, could not have exceeded 200 dollars. A more unfounded pretext for wasting all these *Sacondaga* lands could not well have been contrived.

But admitting that the deposit of these class-rights, with authority to sue out a patent, was truly by way of pledge, or mortgage, for the security of a debt, still, I apprehend, that *Van Rensselaer* had no authority to sell those rights, while they remained in their original shape of certificates, without a previous notice to the party to redeem, nor after they were converted into real estate, without first applying to this Court for a decree or order of sale. The title to the *bona fide* purchaser may be good, but a sale without these previ-

ous steps is a breach of trust, for which the trustee must be responsible.

*Van Rensselaer* says, that *soon after* he received the class-rights, *Hart* gave him verbal instructions to *dispose of and manage them* as he should think best. This very loose authority applied strictly to the class-rights only, and could not have followed them after they were changed into real estate, under the authority given in the transfer itself, to take out a patent in *Van Rensselaer's* name. And, whatever might have been the nature or extent of this verbal authority, there is not a particle of proof that any such authority was ever given. We have only the allegation of *Van Rensselaer*, which, of itself, is no evidence to such a fact. Then, by what right were the lands sold, even admitting they were held as security for a debt?

A bill in chancery to redeem stock, bonds, plate, or other securities, or personal property, pledged for the payment of debts, has frequently been sustained. (*Kemp* v. *Westbrook*, 1 *Vesey*, 278. *Demendary* v. *Metcalf, Prec. in Ch.* 149. *Wanderzee* v. *Willis*, 3 *Bro.* 21.) But, on the other hand, it seems now to be admitted, (though Lord Ch. *Harcourt* once held otherwise,) that the creditor who holds the stock in mortgage is not bound to wait for a bill of foreclosure and decree of sale, as in the case of a mortgage of land, but may sell on reasonable previous notice to the debtor to redeem. This was so decided finally, in the cases of *Tucker* v. *Wilson*, (1 *P. Wms.* 161. 1 *Bro. P. C.* 494.) and of *Lockwood* v. *Ewer*, (2 *Atk.* 303.) The *notice* to the party, in such cases, is, however, indispensable. This seemed to be conceded in the case of *Tucker* v. *Wilson*, and has been so held in other cases. (*De Lisle* v. *Priestman, Brown's Pennsylvania Reports*, 176.) It was the rule of the civil law, that a pledge could never be sold, where there was no special agreement to the contrary, except under a judicial sentence; and this appears to be the law, at this day, in many countries in *Europe*; and it was the rule in the old *English* law, in the time of *Glanvil*, (lib. 10. ch. 6. and 8. p. 159. 163.) as I took occasion *once to show in the case of *Lansing* and *Cortelyou*. (2 *Caines's Cases in Error*, 200.) But if a freehold estate be held by way of mortgage for a debt, then it may be laid down as an invariable rule, that the creditor must first obtain a decree for a sale under a bill of foreclosure. There never was an instance in which the creditor, holding *land* in pledge, was allowed to sell at his own will and pleasure. It would open a door to the most shameful imposition and abuse.

The defendant *Van Rensselaer* thought proper, however,

---

*Margin notes:*

1816.

HART
v.
TEN EYCK.

[ * 100 ]

A bill may be filed in this Court, to redeem *personal property* pledged for the payment of a debt.

But the party holding goods in pledge may sell them without a bill of foreclosure after giving reasonable previous notice to the debtor to redeem.

[ * 101 ]

*Aliter*, in case of a mortgage of *real* estate, which can never be sold without a bill for foreclosure, and a decree for a sale.

to sell these *Sacondaga* lands, and the circumstances attending these sales next attract our attention.

He sold 1,497 acres in *August*, 1791, at public auction, in the city of *Albany*, and the auctioneer (Ev. of *A. G. Lansing*, and exhibit No. 11.) says, he has no doubt public notice was given in the city papers. This is all the evidence we have of a notice. The principal purchaser was *Elkanah Watson*; and we find by the testimony of *Alexander St. John*, that the sales were at an enormous undervalue, and that six of the lots, which produced the total sum of 138*l.* 12*s.* 9*d.*, were, within a year thereafter, sold by *Van Rensselaer* for the sum of 274*l.* 10*s.* This fact is decisive proof that most of these sales were merely colorable, and intended only to extinguish the equitable title of *Hart*, by transferring it to himself. The other lots, which were disposed of at private sale, were, generally, sacrificed at less than half of their then value, according to the testimony of the same witness, who had frequently surveyed in the tract, and had lived near it for 20 years. If these lands had been kept and nurtured, until the infant had come to maturity, they would have afforded a large and independent estate to the plaintiff. Instead of this, the whole tract has been swept away on the most groundless pretences, without leaving scarcely " a wreck behind."

[ * 102 ]    *I think there can be no doubt that the plaintiff is entitled to receive from the estate of *Van Rensselaer* an ample indemnity.

The class-rights, on which the *Sacondaga* location was made, entitled the holder to 5,000 acres of land, and to that extent the location was intended to have been made by *Hart*, in *July*, 1783, as appears from the location itself. But the patent which was afterwards taken out by *Van Rensselaer*, was only for 3,880 acres; and a very important question has arisen in the case, whether *Van Rensselaer* be responsible for the 1,120 acres not embraced by the patent, though covered by the class-rights.

*Van Rensselaer* says, in his answer, that the patent comprehended the quantity of land due for the class-rights which *Hart* had deposited with him; and in his account annexed to the answer, he says, that the 3,880 acres were "equal to class-right certificates received." This answer is shown to be incorrect; for it is incontestably proved that the class-rights deposited amounted to 5,000 acres; yet it *may* be true, notwithstanding, that the surplus of acres were never patented by *Van Rensselaer*, or came, in any way, to his possession or use. There is a difficulty in accounting for the non-appearance, in any shape, of the unsatisfied part of the class-

rights, and I have not been able to discover, by any thing in the case, the real history or fate of those surplus rights.

All the proof we have on the subject is, that when *Hart* located on the *Sacondaga* lands, in *July*, 1783, he did it in consequence of certificates and transfers then delivered, and which, after rejecting one of the rights as bad, entitled him to locate on 5,000 acres. He then, on the 19th *February*, 1787, transferred these certificates or class-rights, "with the benefit of deposit on the aforesaid lands and premises," to *Van Rensselaer*, with authority to take letters patent "for the premises aforesaid." We have, lastly, the certificate of *Van Rensselaer*, of *October*, 1788, that a grant *for the lands, nearly as described in the location of *Hart*, was obtained for 3,880 acres, and no more, and which he held in trust.

[ * 103 ]

This is all the evidence before me on the subject, and it does not appear to be sufficient to charge *Van Rensselaer* with the surplus acres, because we have nothing but surmise or conjecture to fix upon him the fact of having located at some other time, and upon some other lands, to the amount of the unsatisfied class-rights. Whether they have remained to this day in the surveyor-general's office unlocated, or whether *Van Rensselaer* did, in truth, use them afterwards, for his own purposes, is left in obscurity, without any evidence to guide us. The assignment to *Van Rensselaer* seems, from the language of it, to have been intended to operate only upon the specific location which it mentions, and no doubt with the impression that it fully absorbed the claim founded upon the class-rights to which it referred. I am not certain how far the then existing laws would admit of any further location on different lands to supply the deficiency in the location in question. The act of 11th *May*, 1784, (7th sess. chap. 73.) authorizing locations for bounty lands, only provided for the case of the first location being void. It then allowed a fresh location on other unappropriated lands. But if the location was not void, and only contained a greater or less quantity of acres than the person locating was entitled to, it was the duty of the surveyor-general to reduce or extend the bounds of the tract so located, as the case might require. Whatever might have been the cause, the fact is undoubted, that the patent did not issue for the extent of the rights, but only for 3,880 acres; and I should presume that *Hart* must have known of this fact when he gave the order of *February*, 1788, in favor of *Ten Eyck*, for he refers to the patent by its date.

I think, therefore, it would be unsafe, and perhaps unjust, to hold the estate of *Van Rensselaer* responsible for *any further claim for these class-rights, until more certain and

[ * 104 ]

1816.

HART
v.
TEN EYCK.

precise testimony can be afforded, or more light shed upon the subject.

Before I leave this part of the subject, it ought, however, to be observed, that if the patent, instead of containing only 3,880 acres, did really contain, as *St. John* testifies, 4,199 acres, *Van Rensselaer* was responsible for that surplus, and it must now be accounted for. Every advantage of that kind belongs to the *cestui que trust*, and not to the trustee.

Another objection to the credit side of *Van Rensselaer's* account, is the total omission to give credit for the proceeds of class-rights, to the amount of 1,200 acres, which came to the use of *Van Rensselaer*, and were by him located in *St. Lawrence* county. It is in evidence that a class-right of Dr. *Moses Willard*, for 1,000 acres, was by him sold to *J. G. Spangle*, and by *Spangle* to *Hart*, and by him deposited in the surveyor-general's office, in *October*, 1784. He also owned and deposited, at the same time, a right for 200 acres, derived from *James Walsworth, jun.* These two rights were, by an order of *Hart* upon the surveyor-general, of the 12th of *June*, 1787, delivered to *Van Rensselaer;* and it would appear by the order, that a location had been made by virtue of them, at *Black* creek in *Washington* county. (See exhibits 9, 10, 11.) This order was deposited, and the rights specified passed to the credit of *Van Rensselaer*, who, at different times, made deposits of documents for location, and located at other times to the amount he was entitled, on the general credit of his deposits, without specifying which of the documents were intended for any particular location. This appears from the testimony of *Simeon De Witt*, who says, that the location made by *Van Rensselaer*, next after the deposit of the above order of *Hart*, was on the 15th of *June*, 1787, (only three days after the date of the order,) for lots 1, 2, 3, 4, 5, and

[ * 105 ]

6, in *Madrid*, in *St. Lawrence* county, containing *3,840 acres, and he believes that the location was partly made on the rights contained in the order. A patent afterwards issued to *Van Rensselaer* for these lots in *Madrid*. The location of *Van Rensselaer* of the above lots, which was dated the 15th, and filed on the 16th of *June*, 1787, does not refer to any specific class-rights, but is stated in the location itself, to be made " in consequence of the transfers and certificates deposited in the office;" and, in my mind, the evidence is sufficient and decisive, that these rights contained in the order were included in the *St. Lawrence* location; and the only question is, whether *Van Rensselaer* received those class-rights as his own rightful property, or in trust for *Hart*

These rights were vested in *Hart*, and it was incumbent on *Van Rensselaer* to show that they had been transferred

84

to him. The order was only to deliver them to him, by means of which he became merely the agent or trustee. The surveyor-general says, there is not, in his office, any assignment of these shares to *Van Rensselaer*. There is no other evidence of his claim but this order, and that was a simple order of delivery, and passed no right. We are bound to consider the interest in these class-rights as still remaining in *Hart*, at his death, until *Van Rensselaer's* representatives produce a regular assignment or release, founded on some sufficient consideration. The granting of the patent, afterwards, to *Van Rensselaer*, is by no means satisfactory evidence that a regular transfer had been made, or sufficient to supply the absence of such a document, especially, when it is in proof that no such document is in the surveyor-general's office, where, if it had ever existed, it would have been deposited and preserved. The production of the order which gave a control over the certificates, might have been deemed sufficient evidence of authority to take out the patent; and whether the commissioners of the land office judged correctly or not in giving to the order *that force, cannot be material on the question of right between *Van Rensselaer* and *Hart*. The trust would naturally follow the certificates into the land. That *Van Rensselaer* should have been constituted the mere agent or trustee in this case, is not at all surprising, when we consider the blind and fatal confidence which *Hart*, on all occasions, reposed in him ; and it was their course and habit of dealing together, that *Van Rensselaer* should be *Hart's* trustee in his land speculations. This was the case with the *Sacondaga* lands, and, also, with the military bounty lands, as I shall presently show.

*Van Rensselaer* must therefore be adjudged to have taken and held 1,200 acres in the *St. Lawrence* lands, in trust for *Hart*, whose representatives must now convey those lands to the plaintiff, or account for their value.

Another, and which is the only remaining *item* that I shall at present take notice of, in the credit side of *Van Rensselaer's* account, is in the following words : " By the cost of seven and a half soldiers' land rights, as pr. agreement, 6*l.*, 45*l.*"

There is not a particle of proof of the agreement here referred to ; and instead of a credit of 45*l.*, the plaintiff is entitled to follow the rights into the land, and to claim of the representatives of *Van Rensselaer* the land itself, or its value.

*Van Rensselaer* was a trustee for *Hart* for a large and valuable interest in the military tract, and to understand the nature and extent of this trust, we must recur to facts.

1816.

HART
v.
TEN EYCK.

[ * 106 ]

85

1816.

HART
v.
TEN EYCK.

[ * 107 ]

It appears by an agreement, under the hands of *Edward Cumpston*, and of *Van Rensselaer* and *Hart*, dated the 5th of *June*, 1786, (see exhibit No. 13,) that *Van Rensselaer* then had in his hands 63 soldiers' rights of land, purchased by *Hart* and *Cumpston*. That by an agreement between the parties, it was declared, that twelve of those rights belonged to *Cumpston*, 21 of those rights to *Hart*, and the remainder, or 30 rights, belonged to *Van Rensselaer* and *Ten Eyck*. The answer says, that soon after that adjustment, and in the same year, he, *Van Rensselaer*, purchased seven of the 21 rights of *Hart*, at an advance of 20 per cent., and this allegation is the foundation of the credit to which I have referred. But the answer not being, of itself, evidence of such a purchase, and there being no evidence of it in the case, the whole pretence of the purchase must be rejected as destitute of any foundation. *Van Rensselaer* is clearly responsible for these rights; but how to identify them and ascertain their value, is the next and the difficult question. Nothing can be involved in more perplexity than the manner in which this whole trust has been conducted; and if we are not able to extricate the truth, the fault is in the trustee, and the *cestui que trust* must not become the victim of the confusion.

The account says, that seven and a half rights were purchased. The answer says seven; but as 15 rights are admitted to belong to *Hart*, there could not have been more than six rights appropriated by *Van Rensselaer* to himself, under color of a purchase, and he designates 10 lots, out of which he says the seven which he purchased were taken, but he cannot designate which of the 10 were taken. It turns out in proof, (see schedule D. annexed to *Kellogg's Ev.*) that all those 10 specified lots were conveyed by *Cumpston* to *Van Rensselaer*. In such extreme inaccuracy and obscurity is the whole of this transaction involved!

*Van Rensselaer* has not disclosed which were the 30 military lots reserved to *Ten Eyck* and himself. The answer only specified the 15 lots which fell to *Hart*, and most of them are represented as bad titles. It may be, that the 30 lots which do not appear, were a selection of the best titles out of the 51 rights which belonged to *Hart* and the defendants. *Van Rensselaer* had the control and disposition of all these titles. The answer ought to have contained a full and frank exposition of the whole, so that it might be seen whether there had been a just apportionment *of the good and bad titles. Every intendment is to be made in such a case against the omission. It is in proof, by the testimony of *Edward Cumpston*, that *Van Rensselaer*, *Ten Eyck*, *Hart*, and himself, were, by agreement, jointly and equally concerned in the purchase of these soldiers' rights, and that all

[ * 108 ]

86

losses by defective titles were to be equally borne. The adjustment of the portion of these titles in the hands of *Van Rensselaer*, in *June*, 1786, did not relate to the quality or identity of the titles, but only to the number that each party was entitled to; and when *Hart* died, the rights were all still remaining in *Van Rensselaer's* possession, without any such discrimination. It was then his bounden duty, in pursuance of the original agreement, and as a faithful trustee, to see that the apportionment was just and equitable, in quality as well as in number, between the 21 rights belonging to *Hart*, and the 30 rights belonging to himself and *Ten Eyck*. He has not furnished us with the means of knowing that this has been the case. We cannot tell which were the six rights that he elected to appropriate to himself, nor can we tell whether the 15 rights which are specified as having belonged to *Hart*, bore a ratable proportion in value to the whole mass from which they were taken. The rule of law and equity is strict and severe on such occasions. If a party having charge of the property of others, so confounds it with his own, that the line of distinction cannot be traced, all the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it. If it be a case of damages, damages are given *to the utmost value* that the article will bear. (*Armory* v. *Dalamirie*, 1 *Str.* 505. *Lupton* v. *White*, 15 *Vesey*, 432. 2 *Vesey & Beame*, 265.)

In order then to restore to the plaintiff his rights, he is entitled to elect six lots out of any belonging to *Van Rensselaer*, derived from the adjustment in 1786; and if none such are to be found, he is entitled as a compensation in *damages to the average value of six military lots of a good quality in a wild state, and with a good title. In order to determine whether the 15 lots which were finally designated as belonging to *Hart*, were fairly apportioned, in respect to quality and title, an inquiry must be made into the whole 51 lots or rights, in reference to these two objects, to the end that the estate of *Van Rensselaer* may be responsible in damages, for any inequality against the plaintiff which may be found to have existed. Though the titles of the 15 lots specified in the answer, were originally conveyed to *Hart*, yet all the other titles might equally have been in him or *Cumpston*, in the first instance, as the purchases were all made by them, though paid for equally and belonging equally to the whole concern.

I have now finished the examination of *Van Rensselaer's* and *Ten Eyck's* account, as exhibited to the Court of Probates, in 1802, when they applied for leave to sell the whole real estate of *Hart;* and it appears to be impossible to resist

If a person having charge of the property of another, so confounds it with his own that it cannot be distinguished, he must bear all the inconvenience of the confusion; and he must distinguish his own property or lose it; and if damages are given against him, it will be to the *utmost value* of the article.

[ * 109 ]

the conclusion, that if a just and true account of the debts and credits of *Hart* had been presented, it would have shown, that instead of the estate being insolvent, there was a large balance of several thousand dollars in its favor.

2. The next head of inquiry, is the sale of the real estate, under the order of the Court of Probates.

I have no hesitation in declaring my conviction, that the order of sale was fraudulently procured. The manner in which it was procured and executed, betrays a carelessness so gross, and a departure so palpable from the ordinary habits of just and correct proceeding, that we are warranted to impute to the administrators intentions the most unjust.

The statement and valuation of the property, as exhibited to the Court of Probates, gave a very unfavorable view of it. It has been shown, by testimony, that the lands in general were extremely undervalued. Thus, for instance, *the lands in *Butlersbury* were valued short of 2,000 dollars, and they are proved to have been worth, at that time, 6,000 dollars. A lot in the *Royal Grant* was valued at 200 dollars, when it was worth 1,600 dollars. Two lots at *Skenesborough* were valued at 1,000 dollars, and were proved to be worth 3,000 dollars. The 15 military lots, which were assigned to *Hart*, were set down without any specification of the town or lot, and in these general terms, "15 military class-rights, 1,000*l.*" It seems, as if it had been the predetermined intention of the administrators, not to try the experiment whether part of the property would not raise the requisite funds, but to sweep away, at once, the whole real estate, however widely dispersed or imperfectly known. One single lot, out of the 15 military lots, was worth more, in 1802, than what the administrators thought proper to put down as the value of the whole, and five years before that time, *Ten Eyck* had valued these 15 military class-rights, at a "moderate compensation," as worth 11,250 dollars. (See exhibit No. 4.) But I pass over the subject of the valuation, with applying to the case the solid remark of Lord *Eldon*, (*ex parte Bennett*, 10 *Vesey*, 385.) that "it is the duty of a trustee not to bring the property to sale, until all information has been acquired by him for the benefit of the *cestui que trust*, under circumstances likely to make it yield *its utmost value.*"

The act of 1801, under which the application was made directed that the executor, or administrator, should make just and true account of the personal estate and debts, an present it to the Court; and there was a special *proviso*, that no order for the sale was to be made, until he had duly made and filed his inventory. We have seen what an account was presented, and the *proviso* in the statute was entirely disregarded. The Court was then to direct notice to be

88

given to all persons interested, to show cause why the real estate, or a part of it, was not to be sold.   This order was to be published for four weeks, " in two or more *public newspapers, printed in this state, one of which was to be the paper, if any, published in the county where the administration was granted."   The order in this case was made on the 6th of *January*, 1802, and published, and the day assigned for all persons interested to show cause, was the 25th of *February* ensuing.   The order for the sale refers to, and decribes the essential parts of this order for publication, and further states, that it had been published " for four weeks, successively, in two of the public newspapers printed in this state."   So far, it recites a compliance with the very words of the statute; but it stops here, and does not add, " one of which papers was the paper published in the county of *Washington*, where the administration was granted."   Why this omission?   It is a fact of public notoriety, that there was a weekly paper then published at *Salem*, in *Washington* county, and had existed there for some years preceding.   As this is all the proof we have of the notice, and as the order very carefully recites the particulars of the previous notice to a certain extent, and is then silent on another and most interesting particular, we are authorized, by all just reasoning, to conclude that such particulars did not exist.   The statute was thus, in two instances, violated, and both of them in respect to an act to be done in the county of *Washington*, where *Hart* died, and where administration was granted, and where he left valuable property in land and mortgages, which were, afterwards, sold at the auction, at a sacrifice.

But to proceed on this subject; the statute directed, that, at the time specified in the notice, or at some other time, the judge was to hear and examine the allegations and proofs of the administrators, and all others interested; and if upon due examination he found the personal estate insufficient, he was to order so much of the real estate to be sold as should be necessary to pay the debts.   The order of sale bears date the 20th of *March*, 1802, and states, further, that no person appeared to show cause on the 25th of *February*, and *that on the 20th of *March*, the administrators appearing, the judge proceeded to hear and determine the allegations and proofs *by them produced;* (which consisted only, as we are bound to conclude, of their accounts already noticed;) and he then adjudged that the personal estate was insuffi cient, and ordered the whole of the real estate to be sold. It is a little singular that this order, which states the appearance of the administrators on the 20th of *March*, is silent as to the appearance of any person on behalf of the infant heir. It does, however, appear by another exhibit, that on this

1816.

HART
v.
TEN EYCK.

[ *111 ]

[ *112 ]

same 20th of *March*, *John C. Cuyler* was appointed guardian of the infant, to appear and take care of his interest in the premises. I should think, however, that his appointment had been too long delayed. The statute in this, as in other particulars, discovers great solicitude for the rights of the infant heirs of the deceased. It says, "That *in all cases where a petition shall be presented* by any executors or administrators for the sale of the real estate, &c., the Court should appoint a *discreet and substantial freeholder* to be guardian, for the sole purpose of appearing for, and taking care of, the interest of the infant, *in the proceedings therein.*" Here had been a petition presented, the accounts exhibited, an order for publication passed and executed, a day for appearance given and passed by, and on the very day, and almost *eo instanti*, that the sale was decreed, the guardian is appointed. Surely, this was not an appointment sufficiently *early* to meet the intention of the statute, and to enable him to watch over the regularity and accuracy of all the previous proceedings. A stranger to the case, it cannot be supposed that the guardian could have had due time for examination of the accounts, and of the requisite vouchers, and of the state of the real property, its situation and its value, or could have duly deliberated thereupon, as his new and important trust demanded. If any such examination was had, it must have been in the *hurry and agitation of the moment. It must have been performed in the most superficial and careless manner, or all these singular accounts and proceedings could not have passed without a single criticism or objection. That they did so pass, is evident from the order itself, which states the appearance of the administrators, and no other appearance, and adjudges the balance due to the administrators as claimed by them *to the utmost cent*.

But we are not left to inference on this point. We have the testimony of the guardian himself, who says, he was appointed at the request of the administrators; that he was never notified to attend the Court of Probates, nor presented with any account or statement whatever, in respect to the estate or the administrators; that he never made any examination of the accounts or of the estate, and never paid any attention to the proceedings of the Court in relation to the subject, because, he says, he was given to understand that he was to incur no responsibility, and to be at no trouble in the business.

In this way were all the salutary provisions of the statute, anxiously made to guard the rights of infants from invasion and fraud, disregarded and " set at 'nought." It is difficult to contemplate such a case without the strongest emotions. It was a perversion of the regular administration of justice;
90

and the principles of this Court and the safety of private     1816.
right require that it should be publicly known, that such
conduct is not to be endured.  I do not mean, however, to       HART
implicate the moral character of the judge.  I am perfectly    TEN EYCK.
sensible, that in the course of judicial business, Courts
cannot be responsible for the order and regularity of pro-
ceedings.  The parties always take these things at their
peril.  The Court usually waits until some point or some
objection is raised for decision, and presumes every thing
correct, until the contrary be shown.  The judge, in this
case, no doubt, took the accounts upon the party's oath,
*without further inquiry, as no objection appeared, and he     [ * 114 ]
certainly slumbered as to the appointment of a guardian.
But if the Court of Probates was wanting in vigilance, the
party was wanting in duty.  It was the duty of the admin-
istrators, in this case, to see that their accounts were correct ;
that an inventory was filed ; that publication of the order to
show cause was duly made ; that a guardian was timely ap-
pointed ; and that he was duly notified of the proceedings,
and of the time and place to show cause.  Nothing of this
kind took place, and the omission affords just ground to infer
a deliberate design in the administrators to stifle all inquiry.

The order for the sale of the real estate having been
obtained, the administrators gave four weeks' notice, in one
of the *Albany* newspapers, of the sale to take place at
*Albany*, on the 4th of *May*, 1802.  This was the only notice
that was given, though the real estate of *Hart* lay in the
counties of *Washington, Scoharie, Montgomery,* and the then
county of *Onondaga,* as well as in the city and county of
*Albany.*  The ordinary sagacity which a man applies to his
own private concerns would have discerned that such a
notice was insufficient to bring home the knowledge of the
sale to the inhabitants of those counties, who might be
acquainted with the lands, and wished to be concerned in
the purchase.  We know that a Mr. *Stewart* had many years
before expressed a wish to buy the *Skenesborough* lots, and
offered security.  (See *McKinley's* letter, exhibit No. 3.)
Nor was this all.  The form of the notice was still more
defective.  Instead of giving any information, even in what
counties the lands lay, still less of any description of the
particular situation, nature, or quality of the lands, the
notice was only that " all the real estate whereof *Henry Hart,*
late of the town of *Kingsbury,* in the county of *Washington,*
died seised, would be exposed to sale at auction, at the
Tontine Coffee-house, at *Albany,* on the 4th of *May."*  I
do think that this notice was, in itself, a breach of trust.
It was exposing the property to *extreme jeopardy.  If        [ * 115 ]
information did, in fact, reach any of the inhabitants of the

1816.

HART
v.
TEN EYCK.

counties, accompanied with an understanding of the actual property to be sold, it was owing to some casualty or good fortune, not imputable to the notice itself. It is surprising that the sacrifice was not greater. That very advantageous speculations upon the property were made is proved beyond all contradiction. I shall not go into the particulars. There were several hundred dollars lost to the estate, on the sale of three bonds perfectly secured by mortgage ; and the purchaser was the son of *Ten Eyck*, who observed, some days before the sale, that he thought a speculation might be made. There were enormous losses on the sale of the property at *Skenesborough, Kingsbury Royal Grant,* and *Butlersbury.* The son of *Ten Eyck,* who acted, part of the time, as auctioneer, expressed his dissatisfaction, and even disgust, at some parts of the sacrifice. The sales were adjourned to the 12th of *May,* and a fresh notice was given, specifying the military lots to be sold, but this notice was not published in the papers until the day preceding the sale, and the property specified therein was sold, as on the former day, at the same enormous undervalue. Seven military lots produced *only the sum of sixteen hundred and fifty dollars.*

I am not forgetful of what was said upon the argument, as to the obscurity and imperfection of these military titles. But why were they hurried to market on such defective or short notice, and before the state of the titles had been skilfully examined and accurately ascertained ? It was the duty of the administrators to have caused the titles to have been previously explored. They had all the means of knowledge. They were concerned in the original purchases, in 1783, or early in 1784, and *Van Rensselaer* was afterwards made the depository of a great number of military titles, belonging to him, *Ten Eyck,* and *Hart,* and from which he had, at his own pleasure, selected the titles now exposed to

[ * 116 ]

*If an administrator exhibit an untrue account of the personal estate of the intestate, to the Court of Probates, and thereby fraudulently obtains an order for the sale of the real estate, he must not only account for the personal effects omitted in his statement, but is answerable for the real estate sold.*

sale. There never was a case in which *the duty was more clear and pressing on the trustee, to understand the title he was to sell, and not to expose it as clouded and doubtful, to the hazard of speculation. There never was a case, in all the annals of our Courts, surrounded with so many circumstances to show that the property was rashly and wantonly devoted to destruction. There can be no doubt, therefore, from every view of the transaction, that the administrators must answer in damages for all the loss sustained by this unnecessary and unjust sale of the real estate.

3. The last point which remains to be considered, is in respect to the rule or measure of damages.

The charges which have been made out against the defendants are all *torts* and breaches of trust. They differ essentially from cases of damage founded on breaches of

92

contract. Here has been a continued series of bad faith, and it is requisite to the character of public justice, and for example's sake, that the injured party should be completely indemnified, and that the other should answer for all the consequential damages resulting from the fraud. This is a fundamental principle in sound jurisprudence. (*Kaimes's Eq.* vol. 1. p. 97.) The civil law and the *French* law declared this to be the rule; (1 *Domat.* b. 3. tit. 5. § 2. No. 8. p. 407. 409. 411. 426.) and it is easy to illustrate it by cases in the *English* Courts.

In an action of trover·at law, for the conversion of a chattel, it is admitted, that the jury may give special damages beyond the original value of the chattel. (*Fisher* v. *Prince,* 3 *Burr.* 1363. *Whitten* v. *Fulter,* 2 *Black. Rep.* 902.) In the case of *Ivie* v. *Ivie,* (1 *Atk.* 429.) the defendant was charged with a breach of trust, in concurring in the sale of an annuity to the plaintiff's prejudice. Lord *Hardwicke* said, that where a trustee had, in a corrupt or unfair manner, been guilty of a breach of trust, the Court would sometimes compel the trustee to make satisfaction *to the utmost.* But as the defendant in that case had not *acted with unfair motives, he only decreed, that he should, at his own charge, replace the stock by purchasing another annuity of the like nature and value. Indeed, it is a settled principle in this Court, that where a trustee sells stock contrary to his trust, the *cestui que trust* is entitled, at his election, to have the stock replaced, or the produce of it, with the highest interest. (*Bostock* v. *Blackeney,* 2 *Bro.* 653. *Buller,* J., *Pocock* v. *Reddington,* 5 *Vesey,* 800, and *Long* v. *Stewart, note* ib.)

In the application of these principles, we are authorized to say, that where the land in which the plaintiff has an equitable title, exists in the representatives of *Van Rensselaer,* it ought to be conveyed. But where the land has been sold, as in some cases, by *Van Rensselaer* alone, and in others, by the administrators, under the orders of the Court of Probates, they must answer for the value, not as it existed at the time of the sale, for that would not be an indemnity, and would be too great an indulgence to fraudulent breaches of trust, but for the value of the land as it existed at the commencement of the suit, if not at the time of taking the account by the master. I have rather preferred the era of the filing of the bill, as sufficient to afford an indemnity, though I observe the Courts of law, even on contracts to replace stock, have directed the jury to assess damages, to the price of stock at the day of trial, if the market price of it had risen in the mean time. (*Shepherd* v. *Johnson,* 2 *East.* 211. *McArthur* v. *Seaforth,* 2 *Taunton,* 257.) The

1816.

HART
v.
TEN EYCK.

And that according to the value of such real estate, at the time of filing the bill against him.

[ * 117 ]

plaintiff cannot be accused of any unreasonable delay in bringing his suit. His infancy must have continued to within two or three years of the filing of the bill, and that time was short enough for a young heir, deprived of all resources, to seek redress by pacific means; and those failing, to prepare for such an arduous undertaking as a suit of this magnitude. When the suit was brought, he cannot be supposed to have asked for more than the property itself, or [*118] its then equivalent in *value. That value, with the interest on it down to this time, will give the indemnity sought for.

The principles of the decree, as extracted from this opinion, will, accordingly, be to the following effect:—

1. That *Ten Eyck* be charged for all the goods and chattels of *Hart*, (including lumber,) not contained in the inventory, identified and proved by the testimony already taken in the cause, or which may hereafter be given before the master, to have belonged to *Hart* at the time of his death, and which the said defendant shall not show affirmatively, by proof, to have been lost, or otherwise not to have come to his possession without his default.

2. That he be charged with the following debts, specified in his account of the debts due to the estate of *Hart*, unless he can discharge himself, by proof, as aforesaid, viz:—

| | £ | s | d |
|---|---|---|---|
| *John Doty*, . . . . . . . . | £ 7 | 5 | 5 |
| *Henderson & Waites*, . . . . . | 11 | 13 | 4 |
| *Nicholas Van Rensselaer*, . . . . | | 8 | 3 |
| ———— *Bloon*, . . . . . . . | | 8 | 0 |
| *Micajah Ellicott*, . . . . . . . | 1 | 12 | 0 |
| *Henry Sherman*, . . . . . . . | 1 | 3 | 0 |
| | £22 | 10 | 0 |

3. That he be charged with the moneys admitted to have been received by him in the account annexed to his answer, filed in the suit of *Aaron Hart*, in *September*, 1799, and not credited in the account annexed to his answer in this suit.

4. That he be charged with all the rents proved to have been received by him, and not credited in his account in this Court, and particularly with the rents received from *Ralph Schenck*, in wheat, from 1789 to 1802, at the market value, when received.

[*119]    *5. That he be charged with interest on all the goods and chattels for which he shall be charged as aforesaid, to be computed from the first of *February*, 1790, on the then value; and with interest on all the moneys and wheat for which he shall be charged as aforesaid, from the time they were respectively received.

94

6. That the account between *Van Rensselaer* and the estate of *Hart* be stated anew, and corrected in the manner following, that is to say, that all the charges contained in the *debit* side of his account annexed to the answer, and not supported by competent and sufficient proof out of the answer, be disallowed; and that those charges in the same, which are supported by written or other proof, be allowed to the extent of such proof, and no further; that the balance due on the note of the 20th of *May*, 1784, given for final settlement notes, be liquidated and reduced to the market value, in gold and silver, of such notes, on the 15th of *April*, 1785, when the balance due thereon was struck; that the charges for lands furnished *Isaac Lytle* be reduced to the sum of 125 dollars, and to be considered as paid on the 4th of *March*, 1789, when *Van Rensselaer* received the certificate; that the final settlement certificates mentioned on the *credit* side of that account, as having been received in 1791, be credited at their real value at that time; that the credits for the 7½ soldiers' rights, and upon the sales of the *Sacondaga* lands, be wholly omitted; and that the representatives of *Van Rensselaer* be charged, in the account so to be adjusted, with the moneys received by him on the proceeds of the sales of the auction, in 1802; that the balance, if any, that shall be found upon such adjustment to exist against *Van Rensselaer*, be paid by the defendants, who are his representatives, with interest thereon, from the 1st of *June*, 1802.

7. That *Van Rensselaer* be charged with the value of the lands contained in the *Sacondaga* patent of the 25th of *May*, 1787, and not conveyed by him to *Ten Eyck* and *Wright*, in pursuance of the orders of *Hart*, and including the surplus of acres, if any there be, in the patent, beyond the 3,880 acres specified in the patent, and that the value be ascertained as the same lands are worth, without improvements, in *September*, 1808, and that his estate be also charged with interest on that value from that time.

8. That the representatives of *Van Rensselaer* convey to the plaintiff, in fee, 1,200 acres of land, held in his name, at his death, in lots 1, 2, 3, 4, 5 and 6, in *Madrid*, in the county of *St. Lawrence*, to be conveyed as so much land in common with the other lands owned by *Van Rensselaer*, at his death; but if a good title to those lands cannot now be given by the representatives of *Van Rensselaer*, that they then account to the plaintiff for the value of an undivided right to twelve hundred acres in those lots, in *September*, 1808, with interest from that time.

9. That the plaintiff elect six lots out of the military lots held by *Van Rensselaer*, on the 5th of *June*, 1786, as derived

[ * 120 ]

95

from purchases made by the intestate, or *Edward Cumpston;* and that the representatives of *Van Rensselaer* convey the lots so elected to the plaintiff in fee; but if no good titles to such lots can now be given by his representatives, or the same cannot clearly be ascertained for the purpose aforesaid, that the said representatives then pay to the plaintiff the average value in *September*, 1808, with interest from that time, of six military lots, of good quality, in a wild state, and with a good title.

10. That an inquiry be made, by the master, into the quality and title of each of the 51 lots, for which the rights, or transfers, were held by *Van Rensselaer* on the 5th of *June*, 1786, so far as the same can now be ascertained.

11. That *Ten Eyck*, and the representatives of *Van Rensselaer*, be charged with the difference between the price which the lands sold by them, at auction, in *May*, 1802, actually produced, and the value of the same lands in *September*, 1808, independent of any improvements *made between *May*, 1802, and *September*, 1808, together with interest on that value, from the time; and that the said defendants be allowed a ratable deduction from this charge, from such parts (if any) of the military lands then sold, as they can show, by satisfactory proof, did not belong to the intestate at his death.

[ * 121 ]

12. That the defendants be charged with the difference between the price which the bonds and mortgages, mentioned in the pleadings, produced at the auction, in *May*, 1802, and the real value of the same at that time, having reference to the rate of interest and the time of payment; and that they be charged with interest on such difference from that time.

13. That an inquiry be made, whether *Van Rensselaer* obtained any, and what, grants of land for all, or any part, of the surplus class-right of 1,120 acres, beyond the 3,880 acres in the *Sacondaga* patent, and whether the representatives of *Van Rensselaer* can make a good title therefor; and if not, then what was the value of the lands so obtained for these surplus rights in *September*, 1808, with interest on that value from that time.

14. That a reference be made to a master, to take and state an account between the parties, and to make inquiries on the principles of this decree; and that all the testimony and exhibits in the cause may be used as testimony on such reference, together with such further testimony as the parties, or either of them, may think proper to furnish; and that the parties, and the master, have leave to apply, at any time during the progress of the reference, for further direc-

tions ; and that the question of costs, and all further questions, be, in the mean time, reserved. (*a*)

(*a*) The defendants entered an *appeal* from this decree ; and the *Court for the Correction of Errors*, by its decree of the 5th of *April*, 1817, altered and modified the decree of the chancellor in several essential particulars.

---

\*HAWLEY *against* CLOWES.

[ * 122 ]

An injunction to stay waste between tenants in common lies, in special cases ; as to prevent one tenant in common, in possession, from cutting down timber growing on the land, and not wanted for the necessary use of the farm.

THE bill prayed for a partition of land, and for an injunction to stay waste in cutting down and carrying away the timber. It stated, that the plaintiff and defendant owned the land as tenants in common, in equal undivided moieties, and that the defendant is in the actual possession of the whole by himself, or his tenant, and is cutting down the timber, and threatening to persevere ; but admitted the plaintiff's title as tenant in common.

*February* 6th.

An injunction was granted on filing the bill, which was sworn to.

The defendant, in proper person, moved to dissolve the injunction, on the ground that an injunction to stay waste between tenants in common will not lie, and cited *Goodwyn* v. *Spray*, (*Dickens*, 667.) in 1786, and *Smallman* v. *Onions*, (3 *Bro.* 621.) But if the motion could not be granted *in toto*, he then moved that he might have liberty to carry off the wood already cut before the service of the process.

No answer was put in.

*Buel*, contra.

THE CHANCELLOR. The injunction must be modified, so as to confine it to timber then standing and growing on the premises, and not wanted for the necessary use of the farm. The last-cited case admitted the authority of the \*Court to grant the writ between tenants in common, in special cases, as where the defendant was sworn to be insol-

Injunction to stay waste between tenants in common, in certain cases.

[ * 123 ]