EMILY BEAUBIEN et. al., minors *vs.* SIMON POUPARD, administrator.

1840.
First Circuit.

Beaubien
*vs.*
Poupard.

Where the day appointed for an administrator's sale is rainy and inclement, and but few persons appear and bid, and the bids do not exceed half the actual value of the property, it is the duty of the administrator to adjourn the sale.

An administrator cannot become the purchaser at a sale made by him, as administrator; and where an administrator procured his brother-in-law to become the purchaser, and immediately afterwards took a conveyance of the premises so purchased, from his brother-in-law, the sale was set aside, the deeds ordered to be delivered up to be canceled and a re-sale ordered.

Dec. 19.

The bill alledges, in substance, that Lambert Beaubien, was, in his lifetime, seized in fee simple, of a certain tract of land situated in the county of Wayne, described in the bill of complaint; that said Lambert died in the month of September, 1819, intestate, leaving Jean Bt. Beaubien, the father of the complainant, and thirteen other children, his heirs at law; that said Jean Bt. Beaubien, the father of the complainants, as aforesaid, died in the month of December, 1828, intestate, whereby they became seized and possessed of the undivided one-fourteenth part of said tract of land; that on the fifth day of October, 1829, Cecil Beaubien, the widow of said Jean Bt. Beaubien and mother of the complainants, presented a petition to the judge of probate of Wayne county, praying that administration on the estate of said Jean Bt. might be granted to her; but before any action was had on said petition, the defendant also presented an application to said judge for letters of administration on the estate of said Jean Bt. Beaubien; that April 23d, 1830, the said defendant, with the assent of said Cecil, was duly appointed administrator on the estate of said Jean Bt. Beaubien, and took upon himself that trust, according to law; that an inventory of the estate was duly filed in the office of said judge of probate, by which it appeared that the real estate was appraised at $800, and the personal estate at $81. 92; that on or about the 6th day of December, 1830, the said defendant presented to said judge of probate a paper, representing, among other things, that

he believed the estate of said Jean Bt. was indebted in the sum of four hundred dollars, and that the said estate was insolvent, and prayed the appointment of commissioners to examine the claims of the several creditors of said estate, which prayer was granted, and the commissioners appointed, after executing the trust reposed in them, made their report; by which it appeared that all the claims allowed against said estate amounted only to the sum of $110 26; that on the 17th day of October, 1831, the defendant, as administrator aforesaid, presented a further petition to said judge of probate, stating, among other things, that the personal estate of said Jean Bt. was insufficient to pay the debts due by said Jean Bt., at the time of his death, and the charges of administration, and praying to be licensed and empowered to sell so much of the real estate of which the said Jean Bt. died seized, as might be sufficient to pay said debt and charges; that on the 7th day of November, 1831, the prayer of the said defendant, administrator, as aforesaid, was granted, and license was granted to sell certain lots, numbered 12, 140, 157, 142 and 113, or so much thereof as might be necessary for the purposes aforesaid; said lots having been duly set off to the complainant by the circuit court of said county, upon a partition of the said real estate of which the said Lambert died seized; that on the 20th day of October, 1832, the said defendant, as administrator, having first given the bond, taken the oath, &c., required by law, did sell at public auction the said lot numbered 12, at which sale the same was struck off to one Louis Beaubien, the brother-in-law of said defendant, for the sum of $150.

The bill charges, that although the said lot numbered 12, was at said sale, struck off to said Louis, yet the said purchase by him was made pursuant to an understanding or arrangement, entered into previous to said sale, between said defendant and said Louis, and that said sale was to accrue to the benefit of said defendant.

The bill avers, that on the 30th November, 1832, the said defendant, in his capacity as administrator, aforesaid, did execute and deliver, in due form of law, to said Louis, a deed of

said lot numbered 12, and that on the same day, the said Louis and his wife, for the consideration of $150, did quit-claim to said defendant said lot No. 12; and further, that December 3, 1832, the defendant did further cause both of said deeds to be duly recorded at his own cost and charges.

The bill further charges, that the defendant further disregarded the rights and interests of the complainants, who were infants, by not offering for sale some one or more of the other lots he was authorized to make sale of, instead of said lot No. 12, the said lot being a water lot and not saleable, while the others were eligibly situated and in demand, and would have sold for a comparatively much higher price.

That said lot No. 12 would have sold for a much greater sum, but for the fraudulent conduct of the defendant; in proof whereof, the complainants aver, that the said defendant concealed the time of sale from the guardian of the complainants, who had made arrangements to prevent a sacrifice of their interests, until the day of sale, although the said defendant promised to give said guardian timely notice thereof.

That after said lot No. 12 was advertised for sale, the said guardian applied to the defendant, and desired to be informed in due season, of the day of sale, to which the defendant replied to said guardian, who was unlettered, and unable to read or write, that he could not state with precision the time of sale, although he well knew he had appointed a day for that purpose. That the guardian, on being advised by the defendant, that the said sale was to take place forthwith, remonstrated with the defendant for his neglect in not giving her timely notice, &c., and urged the propriety of postponing the said sale; to which the defendant replied, that said sale could not be postponed.

That there were but few bidders at said sale, and that the weather was inclement, notwithstanding which, the said defendant refused to postpone said sale, and that said lot sold for about one-half its real value.

The bill further charges, that the information with regard to the day of sale, was withheld from the guardian of the com-

plainants, by the defendant, in order that he might promote his own interest; avers that the defendant owned a lot adjoining said lot No. 12, which would be greatly enhanced by obtaining said lot No. 12.

The bill further states, that the defendant, before said sale, said that he would procure some person to bid in said lot for him, as he could not legally or lawfully purchase, himself.

The answer admits that Lambert Beaubien was, in his lifetime, seized of the premises; that he died intestate, leaving heirs, as stated in the bill; that defendant, Poupard, was appointed administrator; that an inventory of the estate was filed in the office of the judge of probate; that the real estate was appraised at $800, and the personal estate, at $81 92. That the estate was represented insolvent, and commissioners were appointed, as stated in the bill. The answer further admits the petition of the defendant, as administrator, for license to sell the real estate, and that license was granted to sell the same by the judge of probate, and that lot No. 12, was sold October 20, 1832, at public auction, by defendant, as administrator, and that the same was struck off to Louis Beaubien, the brother-in-law to said defendant, for the sum of $150; states that said Louis Beaubien was the highest bidder, and that $150 dollars was the highest sum bidden therefor.

The answer further states, that among many other citizens whom defendant solicited and urged to attend said sale, with a view of making a beneficial sale for said estate, of said lot, he spoke to said Louis Beaubien to attend and bid for the same, and that defendant told the said Louis, if he bid on said lot, and it was knocked off to him, this defendant would take it from him, but defendant and the said Louis both distinctly understood, that if it was knocked down to the said Louis, he was at full and perfect liberty to keep the same, at the price bid therefor; and that there was no agreement, or any public or private understanding by or between the said Louis and this defendant, as charged in said bill, that he, the said Louis, was purchasing the same for defendant; but the said defendant so spoke to the said Louis, to induce him to bid for the same,

and with the sole view of making the lot sell for a fair value. Denies that the deed from defendant, as administrator to Louis Beaubien, of said lot No. 12, and the deed from said Louis Beaubien and wife to defendant, were recorded on the same day, and the record of both deeds paid for by defendant; denies that defendant disregarded the rights and interests of the complainants, by not offering some one or more of the other lots, instead of said lot No. 12. The answer further states, that the defendant "does not now remember whether, on the day of sale, the said guardian, or any other person, desired a postponement of the sale;" denies that defendant ever told the said guardian, that said sale could not be postponed; admits defendant owned the adjoining lot, in the right of his wife; states that defendant does not remember that he ever stated, before the sale, that he would procure some person to bid in said lot, as charged in the bill; denies all fraud, &c.

WHIPPLE and VAN DYKE, for complainants.

It will be perceived upon reading the bill, that the complainants are minors, and claim the relief prayed for upon two distinct grounds:

1. That the defendant, through the intervention of a third party, Louis Beaubien, purchased the lot in contest; and,

2. Admitting that he did not so purchase, yet, that the defendant was guilty of such gross misconduct in conducting the sale, as would warrant the interposition of a court of equity.

With respect to the first ground the law is indisputable. The defendant was administrator on the estate of Jean Bt. Beaubien, and sustained the relation of an agent, not only with respect to the creditors of the estate, but the heirs at law. Sustaining this relationship, the question first presented is, could he legally become the purchaser of the lot in question? In support of the negative of this proposition, the reference in the margin is full and explicit, and renders it unnecessary to multiply authorities, as it embodies all the leading decisions in this country and in England, on the subject.

The law being clear, the question arises, whether, in fact,

the defendant did, through the agency of Louis Beaubien, purchase the lot designated in the bill as No. 12.   To answer this question, reference must be had to the pleadings and depositions in the cause.

Upon this point the defendant answers: "*That he spoke to said Louis Beaubien, to attend and bid for the same, and told said Louis if he bid upon said lot, and it was knocked off to him, he, (the defendant,) would take it from him; but the defendant and said Louis both distinctly understood that if it was knocked down to the said Louis, he was at full and perfect liberty to keep the same at the price bid therefor; that there was no agreement, nor any public or private understanding, by or between the said Louis and the defendant, that the said Louis was purchasing the same for the defendant, but the said defendant so spoke to the said Louis to induce him to bid for the same, and with the sole view of making the lot sell at a fair value.*" This portion of the answer is drawn up with apparent skill, and would seem to rebut the allegation in the bill to which it is responsive; but, upon examination, it will be found to admit sufficient to bring him within the rule of law above referred to.

1. The defendant admits that he requested Louis Beaubien to "attend and bid."

2. That he told the said Louis, that "if he bid on said lot, and it was struck off to him, he, (the defendant,) would take it from him."

Here is a clear admission of the allegation in the bill, that, by some agreement or understanding, the lot, although struck off to said Louis, was, in fact, for the defendant; and the defendant cannot escape from the effect of this admission, by stating "that it was distinctly understood, that if it was knocked down to him, the said Louis, he was at full and perfect liberty to keep the same at the price bid therefor;" for, no legal proposition is better settled than that which prohibits a party from availing himself of his own wrong.   Had Louis Beaubien refused to convey to the defendant, he certainly could not have coerced a conveyance, for he would have been met with the proposition that the agreement was void, as being against

the policy of the law. It is, therefore, a *correct legal inference* drawn by the defendant, that the said Louis "*was at full and perfect liberty to keep the lot.*"

But the defendant further states, that "*there was no agreement, nor public or private understanding between him and the said Louis, that he, the said Louis, was purchasing for the defendant.*" In making this declaration, the defendant seems to have forgotten the admission previously made, "*that if he (the said Louis,) bid on the lot, and it was struck off to him, he, (the defendant,) would take it from him.*" This last admission is sufficient for our purpose, showing as it does, most conclusively, that, while Louis Beaubien was entirely ignorant of the object the defendant had in view, in getting him to attend the sale and bid for the lot, the defendant's purpose was to purchase the lot, and shield himself from the consequences in the manner stated in the bill. It is not believed that Beaubien understood the defendant's object in urging him to bid, or he would have shrunk from doing an illegal act, the effect of which might work injuriously to the infant heirs of his deceased brother.

It may be contended that the defendant's denial of the allegation in question, being full and explicit, it must be taken as true, provided it is not rebutted by evidence. The general rule, that the answer is to be received as true, is to be taken with some qualifications. For instance, if the answer is contradictory, or inconsistent, (as in this case;) or if it is evasive, the court will not feel bound to enforce the rule, but give to the answer such weight as, under the circumstances, it is entitled to. Apply these principles to this case: the defendant denies, generally, that there was "an understanding or agreement" between him and Beaubien respecting the purchase of the lot. Now, this may be true, and would be conclusive, if the answer did not further admit, *that Beaubien went to the sale and bid at his special request, and with the express understanding that the defendant would take the lot from him.*

It is very clear, even from the answer, that the defendant's object was to purchase the lot, but in such manner as to avoid

the legal difficulty in his way; *this difficulty he was aware of,* and the mode adopted by him to get rid of it, although well planned, cannot avail him in a court of equity, where the *motives and intentions* of a party are looked into and scanned, especially where the rights and interest of infant heirs are involved.

But the complainants are not driven to the necessity of relying upon the answer to make out this case. The testimony before the court, establishes, beyond all question, the *motive and intention* of the defendant, in getting Beaubien to go to the sale and bid for the lot.

Cecil Beaubien testifies "that the defendant told her, that if said lot No 12, did not sell for too high a price, he, (the defendant,) would purchase it himself, and that this conversation took place about two weeks previous to the advertisement of sale, as she believes."

Joseph Campau, jr., states, that during a conversation had between the defendant and Edward Campau touching said lot and the present suit, the "defendant remarked to said Campau, that he had bought the lot, and considered it his."

Edward Campau testifies with respect to the conversation referred to, and states that "the defendant remarked that he had bought the lot in question, as it was sold cheap."

*Louis Beaubien testifies,* "that when he bought the said lot, he considered it as his own property; that the defendant told him that if he did not wish to keep the lot, he would take it off his hands, the defendant paying him the amount for which it was struck off, and the costs of drawing the deed;" and, upon his cross examination, he further states, "that the defendant came to him on the morning of the sale, whereupon the defendant stated to him, that he had no money to purchase; to which the defendant replied, that if he had no money to purchase, he would lend him some, or take the lot off of his hands if he did not want it;" and that "*he would not have purchased it, if the defendant had not offered to advance him the money, or take it off his hands.*"

This embraces all the direct testimony relating to the purchase, and shows irresistibly that the lot was, in truth and in fact, bought by the defendant. The remark made by the defendant to Beaubien, that he would "lend him money or take the lot off of his hands," was only a measure adopted by the defendant the more effectually to conceal his design.

But there are collateral circumstances and circumstantial proof, having a direct bearing on the question, and which establishes the fact with as much certainty as the positive testimony of the witnesses.

1. Why did the defendant conceal the time of sale from the guardian of the complainants, who applied for information on the subject?

2. Why did he conceal the day of sale from the guardian, until the morning the lot was advertised for sale?

3. Why remark to the guardian when she suggested to him the impropriety of selling, as the day was rainy, that he could not postpone the sale?

4. When he found that "only one or two persons bid on the lot at the time of sale, beside the purchaser," why did he not postpone it, especially as the day was rainy?

5. Why offer a lot for sale which was not saleable, according to the testimony of Mr. Desnoyers?

These are strong circumstances, *and are all fully proved,* as will be seen by an examination of the testimony, and contradict the answer in several important particulars, which will, according to well established principles, induce the court to give but little weight to the other portions of the answer that remain unsupported by other testimony.

The defendant admits that the lot was worth more to Joseph Campau, senior, than any other person, because he owned the one adjoining. For the same reason, it was worth more to the defendant, who also owned one adjoining lot. It is then manifest, that there was and must have been a strong temptation, on the part of the defendant, to obtain the lot in question; and this fact alone will weigh strongly, were the evidence nicely balanced.

II. The gross misconduct of the defendant, in conducting the sale, will warrant the interposition of this court.

1. It is averred in the bill, and the averment is sustained by several witnesses, that the day of sale was inclement and rainy, which should have induced the defendant to postpone it.

2. It is shown, further, that there were only one or two bidders present at the sale, exclusive of Beaubien.

3. It is also shown, that the day of sale was concealed from the mother and guardian of the complainants.

4. The defendant, upon a request made by the said guardian, that the sale should be postponed, replied that " he could not postpone the sale."

5. It is very manifest, that the defendant should have offered for sale one of the dry lots, which was saleable, rather than a water lot, which was unsaleable.

These are some of the prominent facts which go to establish the allegation of gross misconduct, and in the eye of a court of equity, fraud.

It is the peculiar province of this court, to guard and protect the rights of infant heirs, and if, in the discharge of his duty, as administrator, and in conducting the sale, the defendant did not exercise that sagacity and prudence, which is usually exercised by persons transacting their own business, he will be responsible. (*See* 2 *J. C. R.*, 76.) In this case, the court carried the investigation beyond the order of the probate court, and examined into the conduct of the defendants. And the simple fact, in the present case, that the debts due by estate were nominal, and might have been paid in three months, by *leasing* the real estate, is another strong circumstance in support of the allegation, that the defendant sought to advance his own interest, rather than protect the rights of those he represented, and comes within the scope of chancellor Kent's reasoning, in the authority cited. It will also be perceived, by this authority, that the chancellor comments with much severity, upon the conduct of the defendants, in conducting the sale, by not giving notice, &c., and for not exercising proper vigilance and care, in order to obtain the highest price for the

Beaubien
vs.
Poupard. lands they sold. The acts of the defendant in this case, so far as the sale is concerned, is obnoxious to the censure cast upon the defendants in the case referred to, and are, in contemplation of the law, fraudulent.

B. F. H. WITHERELL for defendant.

Jean Bt. Beaubien, the father of the complainants, died in December, 1828, intestate, leaving the complainants his heirs at law.

Simon Poupard, the defendant, became, at the request of the family, administrator.

In settling the estate, it became necessary to sell real estate to pay debts and incidental expenses.

Poupard obtained a license from the judge of probate, gave bond according to law, advertised according to law, and sold water lot No. 12, on the Lambert Beaubien farm, so called, at auction, for $150, to Louis Beaubien.

The complainants alledge that the lot was struck off to *Louis Beaubien;* that it was in *fact* for the defendant, Poupard; and that he, being as administrator, a trustee for complainant, could not purchase directly or indirectly.

The defendant alledges that he did not purchase at the sale at auction, either directly or indirectly; that he made great efforts to procure bidders to attend the auction, and personally called on several who were interested in adjoining lands, and on one Joseph Campau, whose peculiar interest it was to purchase the lot in question, and who was fully able so to do.

That, among others that he solicited to attend and bid, was the said Louis Beaubien, the uncle of the complainants; that, to induce said Louis to attend and bid, for the purpose of raising as large a sum as possible for the lot, said Poupard, said to said Louis, that if he would attend and bid, "if the lot should be knocked off to said Louis, and that if he did not wish to keep it, he, said Poupard, would take it of him; that said lot was sold to said Louis, bona fide, for $150; that said Louis had a perfect right to keep the lot, but *subsequent* to the sale, concluded to let said Poupard have it, and that the land, afterwards,

was conveyed to the said Louis, and by him subsequently to said Poupard; that it was sold for all that it was worth, and that the whole transaction was in good faith.

THE CHANCELLOR.—The several allegations in the bill, upon which relief is sought, are sufficiently met by the answer, except so far as they relate to the sale of the lot in question.

The proceedings before the court of probate, and notice of the sale, &c., seem to have been regular and fair. It is alledged in the bill, and is not denied in the answer, that the administrator, before the sale, expressed a desire or intention to purchase the lot. It also appears that he requested Louis Beaubien to attend the sale; that Louis Beaubien told him that he had no money, to which Poupard replied, he would lend him the money, or would take the lot; that the day of sale was rainy and inclement, and there were but one or two persons who bid on the lot, besides Beaubien, who purchased it; and that the lot was agreed to be conveyed to Beaubien, and by him back to Poupard, on their return from the sale. The inference, I think, is strong, that the sale was, in fact, to Beaubien, for the benefit of Poupard, although there does not appear to have been an express agreement to that effect. Else why the strong urgency that Beaubien, who confessedly had no money to pay for the lot, should attend the sale. Poupard, it seems, knew that Beaubien could not pay for the lot, and the offer to lend him money or take the lot off his hands, still leaving the option with Poupard to do either the one or the other, and the known fact, that Beaubien was unable to buy himself, in effect secured the lot to Poupard; and it was so consummated immediately after the sale. The administrator, I think, erred, acting in the capacity he did, in not adjourning the sale, when the day was rainy and inclement, and there were but one or two bidders beside Beaubien. It may have been, that the desire of Poupard to secure the lot, had no influence upon this decision. But if a sale of this character should be sustained, it would open the door for frauds, and would certainly throw great temptations before trustees acting in this capacity. I am satisfied that Louis Beaubien had no intention of aiding

Poupard in purchasing the lot improperly; but he purchased under the promise that Poupard would take it off his hands. It makes no difference by what means an administrator secures the benefit of a purchase, at a sale made by himself; the rule is imperative, that he cannot become a purchaser at all.   12 *Peters' Rep.*, 25, *Hart* vs. *Ten Eyck*; 2 *Johns. Ch. Rep.*, 62.

I see no reason to suppose, that Poupard intended, in fact, to commit a fraud upon the rights of the heirs, but enough appears, to show that he intended to secure the lot under the sale.   To sustain this sale, would in effect break down the salutary rules of law upon this subject, and expose the rights of minors to the adroit management of an interested trustee.

The sale must be set aside, and the deed to Beaubien, and from him to Poupard, cancelled, and a re-sale ordered, according to the prayer in the bill.